

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-13-2004

# Rompilla v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 00-9005

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Rompilla v. Horn" (2004). *2004 Decisions.* Paper 1047.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1047

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 13, 2004

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 00-9005, 00-9006

———————

RONALD ROMPILLA

v.

MARTIN HORN, COMMISSIONER,
PENNSYLVANIA DEPARTMENT OF
CORRECTIONS

Martin Horn,

Appellant/Cross-Appellee

———————

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 99-cv-00737)
District Judge: Honorable Ronald L. Buckwalter

———————

Argued: May 22, 2002

Before: SLOVITER, ALITO, AND STAPLETON,
*Circuit Judges.*

(Filed: January 13, 2004)

AMY ZAPP (Argued)
Senior Deputy Attorney General
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120

Counsel for Appellant/Cross-Appellee

BILLY H. NOLAS (Argued)
DAVID W. WYCOFF
MICHAEL WISEMAN
Defender Association of Philadelphia
Federal Court Division
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106

Counsel for Appellee/Cross-Appellant

## OPINION OF THE COURT

ALITO, *Circuit Judge*:

The Commissioner of the Pennsylvania Department of Corrections (hereinafter "the Commonwealth") appeals from a District Court order granting the petition for a writ of habeas corpus that was filed by Ronald Rompilla, a Pennsylvania prisoner who was sentenced to death. The District Court ordered that Rompilla be released unless he is either resentenced to life imprisonment or a new penalty phase trial is held. Rompilla cross-appeals from the denial of his petition insofar as it challenged his conviction. We conclude that the Pennsylvania Supreme Court's decision regarding Rompilla's sentencing proceeding was not contrary to and did not involve an unreasonable application of clearly established Supreme Court precedent, and therefore we reverse the decision of the District Court with respect to Rompilla's sentence. We affirm the decision of the District Court with respect to his conviction. By separate order, however, we have granted Rompilla's application to file a successive petition for a writ of habeas corpus so that he will be able to assert his claim that, under *Atkins v. Virginia*, 536 U.S. 304 (2002), he may not be executed because of mental retardation.

### I.

In 1988, Rompilla was tried for the murder of James Scanlon. Scanlon's body was found lying in a pool of blood in his bar, the Cozy Corner Café in Allentown,

Pennsylvania. Scanlon had been stabbed repeatedly and set on fire. There were no eyewitnesses to the killing, but the Commonwealth introduced substantial circumstantial evidence of Rompilla's guilt. In its opinion on direct appeal, the state supreme court summarized the prosecution's evidence as follows:

> Appellant was seen in the Cozy Corner Café on January 14, 1988, from approximately 1:00 a.m. to 2:00 a.m. During that time, he was observed going to the bathroom approximately ten times. A subsequent police investigation determined that the window in the men's bathroom was used as the point of entry into the bar after it had closed.

> When questioned by an investigating detective from the Allentown Police Department, Appellant stated that he had been in the Cozy Corner Café on the night of the murder and left between 2:00 a.m. and 2:30 a.m. because he had no money. He stated that he had only $2.00 to buy breakfast at a local diner. A cab driver testified that he picked up Appellant at the diner and drove him to two different hotels where Appellant was unable to rent a room. The driver then took Appellant to the George Washington Motor Lodge where he was able to rent a room. Appellant paid the cab fare of $9.10.

> Appellant rented a room for two nights at the George Washington Motor Lodge. In doing so, he paid $121.00 in cash and flashed a large amount of cash to the desk clerks. Appellant also used a false name when he checked in.

> The police secured a search warrant for Appellant's motel room and seized several items, including Appellant's sneakers. These sneakers matched a footprint in blood that was discovered near the victim's body. In addition, the blood found on the sneakers matched the victim's blood type.

> The Commonwealth also presented other circumstantial evidence that linked Appellant with the robbery and murder of James Scanlon. First, Mr. Scanlon's wallet was found by a groundskeeper in the

bushes, six to eight feet outside the room that Appellant had rented at the George Washington Motor Lodge. Second, Appellant's fingerprint was found on one of the two knives used to commit the murder. Finally, there were numerous inconsistencies between what Appellant had told the police concerning his activities on January 14 and 15, 1988, and the testimony of other witnesses.

*Commonwealth v. Rompilla*, 653 A.2d 626, 629 (Pa. 1995). The jury found Rompilla guilty of first degree murder and other related offenses.

At the penalty phase of the trial, the prosecution attempted to establish three aggravating factors: (1) that Rompilla committed the murder while perpetrating a felony, 42 Pa. C.S. § 9711(d)(6), namely, the burglary and robbery of the bar; (2) that he committed the murder by means of torture, 42 Pa. C.S. § 9711(d)(8); and (3) that he had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa. C.S. § 9711(d)(9). To establish torture, the Commonwealth called Dr. Isidore Mihalakis, a forensic pathologist, who testified to the multiple wounds inflicted on Scanlon and opined that Scanlon was conscious and alive when many of those wounds were inflicted. App. 698-707. Based on the nature of the wounds, Dr. Mihalakis also opined that Scanlon's killer had deliberately attempted to inflict pain before Scanlon died. *Id.* at 707-08. To show the defendant's prior history of violent felonies, the Commonwealth proved that he had been convicted in 1976 of rape, burglary, and theft. App. 651-52. *Commonwealth v. Rompilla*, 378 A.2d 865 (Pa. 1977). The testimony of the rape victim, which was read into the record, showed that Rompilla had burglarized a bar after closing and had raped the bar owner and slashed her with a knife. App. 662-696.

The defense presented the testimony of five members of the Rompilla family. Rompilla's older brother, Nicholas, and his wife, Darlene, testified that Rompilla had lived in their home with their children for the three and one-half months before the killing. Nicholas testified that he and the defendant had grown up together, that the defendant had worked for him as a house painter before his arrest, and

that the defendant had also helped out around the house. App. 738-41. Nicholas said that he had visited his brother frequently in prison and that they had a good relationship. *Id.* at 739. Nicholas added that he did not think that his brother had killed Scanlon, whom he had known for about 10 or 11 years, and that his heart went out to the Scanlon family. *Id.* at 740. He concluded his testimony by asking the jury to have mercy on his brother. *Id.* at 741.

Darlene Scanlon testified that her children were "very attached" to the defendant and that he "was very good in our house." App. 734-35. Darlene said that he helped out in the home and that "he was a good family member" who felt "strongly about family" and "respected the family very well." *Id.* at 735. While the defendant was in prison, Darlene testified, he frequently wrote to her and spoke about "[f]amily, his son, his wife, his brothers and sisters." *Id.* She stated that the defendant's relationship with his son was good. *Id.* at 736. Like her husband, Darlene testified that she had known Scanlon, that she did not believe that the defendant had killed him, and that she felt for the Scanlon family "[v]ery, very much." *Id.* Weeping, she concluded her testimony by telling the jury: "We go to bed crying, we wake up crying, it's been very hard on my children . . . . [W]e want Ron alive even if it's in jail, we want him alive." *Id.*

Another brother, Bobby, also took the stand. Bobby testified that during the time when the defendant was out of prison they had an "[e]xcellent relationship" and were "[v]ery close." App. 745. Before then, according to Bobby, he had visited the defendant in prison and the defendant had written him letters in which he expressed great concern for his son and other family members. *Id.*

The defendant's sister, Sandra Whitby, testified that she had grown up with the defendant. App. 754. Crying, she said that she loved him very much and that she thought that he was a "good person." *Id.* at 755. Asked what things were important for the defendant, she answered: "Family, his son, his wife, things my children were doing, my brothers." *Id.* She testified that she was praying for the Scanlon family and for her brother's life. *Id.* at 756. She added: "[W]e're not God, and we can't take people's lives

(crying) . . . I love my brother. Taking one life is never going to replace another life." *Id.*

Finally, Aaron Rompilla, the defendant's 14-year old son testified. He said that after his father's release from prison they had regular visits, which he enjoyed, that his father was proud of him, that he loved his father, and that he would visit him if he was sentenced to prison. *Id.* at 757-59. He said that he did not think it would be "right" to sentence his father to death, and when he was asked whether there was anything else he wanted to tell the jury, he simply cried. *Id.* at 759.

In her closing argument, defense counsel made an impassioned plea for Rompilla's life. Her closing appears to have had three major themes. First, she repeatedly stressed that, although the jury had found the defendant guilty, they must have had at least some lingering doubt about what had happened, and therefore they should not sentence him to death, which "is final, irreversible." *Id.* Second, she reminded the jury of the good qualities mentioned by Rompilla's family members. She argued that Rompilla was "more than this act that you have found him to have committed," *id.* at 769, and she emphasized the love of Rompilla's family members. *Id.* at 773. She particularly asked the jury to keep in mind the defendant's 14 year old son, who had come to court to ask the jury "not to kill his father." *Id.* Third, she pled for mercy and warned the jury: "I tell you this from the bottom of my heart, if you order death, it will take a part of your life away. Don't stain your hands and your souls with this man's blood, don't do it please." *Id.* at 772.

After deliberating, the jury unanimously found all three of the aggravating circumstances alleged by the prosecution, and the jury stated that one or more members found two mitigating factors under the "catchall" provision of 42 Pa. C.S. § 9711(e)(8), i.e., "Rompilla's son being present and testifying" and the possibility of rehabilitation. The jury found that the aggravating circumstances outweighed the mitigating factors and sentenced Rompilla to death.

The Pennsylvania Supreme Court affirmed the conviction

and sentence. *Commonwealth v. Rompilla*, 653 A.2d 626 (Pa. 1995) (hereinafter "*Rompilla-1*").[1] In December 1995, Rompilla filed a petition under the Pennsylvania Post-Conviction Relief Act ("PCRA"). After an evidentiary hearing, the PCRA denied the petition, and the Pennsylvania Supreme Court affirmed. *Commonwealth v. Rompilla*, 721 A.2d 786 (Pa. 1998) (hereinafter "*Rompilla-2*").

Rompilla then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Pennsylvania. Rompilla's petition raised 11 claims. *Rompilla v. Horn*, No. Civ.A.99-737, 2000 WL 964750 (E.D. Pa. July 11, 2000).[2] The

---

1. While the case was pending on direct appeal, Rompilla filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania. The District Court dismissed the petition without prejudice for lack of exhaustion. *Rompilla v. Love*, No. 94-cv-4196 (E.D. Pa.).

2. The claims as identified by the District Court were as follows:

(1) Trial counsel were ineffective at the capital sentencing phase for failing to investigate, develop and present significant mitigating evidence related to petitioner's traumatic childhood, alcoholism, mental retardation, cognitive impairment and organic brain damage;

(2) Petitioner is entitled to relief from his conviction and death sentence because of the trial court's improper instruction on accomplice liability;

(3) The trial court's failure to instruct the jury that "life imprisonment" means life without possibility of parole, even after the jury repeatedly asked about parole eligibility; and the trial court's provision, instead, of inaccurate and misleading information, violated petitioner's Sixth, Eighth and Fourteenth Amendment rights;

(4) Petitioner is entitled to relief from his death sentence because the (d)(8) aggravating circumstance was unconstitutionally obtained;

(5) Petitioner is entitled to relief from his death sentence because the (d)(9) "significant history" of felony convictions aggravating circumstance is unconstitutionally vague; the jury instructions did not cure this vagueness; and the jury instructions, to the extent they provided guidance at all, directed a finding of this aggravating circumstance;

District Court denied relief as to the guilt phase but granted relief as to the penalty phase based on its conclusion that counsel had been ineffective in failing to investigate and present mitigating evidence. *Id.* at \*14. The District Court thus ordered that a writ of habeas corpus would be granted unless the Commonwealth conducted a new sentencing hearing or resentenced Rompilla to life imprisonment. *Id.* at \*21. The Commonwealth appealed, and Rompilla cross-appealed. Three questions are presented on appeal: (1) whether Rompilla's trial counsel was constitutionally ineffective during the penalty phase; (2) whether the trial court committed constitutional error in giving an accomplice liability instruction; and (3) whether the trial court erred in failing to instruct the jury that "life

---

(6) Petitioner is entitled to relief from his death sentence because of improper prosecutorial argument at the penalty phase;

(7) Petitioner is entitled to relief from his death sentence because the trial court improperly allowed the prosecutor to read to the jury the inflammatory and prejudicial testimony of the victim of a prior rape and counsel were ineffective for failing to cite controlling authority that would have prevented the introduction of the inflammatory and prejudicial evidence;

(8) The seating of the juror who visited the scene of the crime ten times, including, during the trial proceedings, who knew the victim of the offense and the victim's son, who knew an employee of the prosecutor's office and who expressed substantial doubts regarding the presumption of innocence; and trial counsel's failure to challenge this juror for cause, violated petitioner's sixth, eighth and fourteenth amendment rights;

(9) Petitioner's death sentence should be vacated because the arbitrary "proportionality review" performed by the Pennsylvania Supreme Court violated his Eighth Amendment and Fourteenth Amendment rights;

(10) Petitioner is entitled to an evidentiary hearing on his claim that the prosecution violated his due process by introducing false and misleading evidence; and

(11) Petitioner is entitled to relief because of cumulative prejudicial effects of errors in this case.

*Rompilla*, 2000 WL 964750.

imprisonment" under Pennsylvania law meant life without the possibility of parole.[3]

## II.

Because the District Court did not conduct an evidentiary hearing, our review of that Court's decision is plenary. *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir.), *cert. denied*, 122 S. Ct. 269 (2001). However, our review of the decision of the Pennsylvania Supreme Court is circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Hartey v. Vaughn*, 186 F.3d 367, 371 (3d Cir. 1999). Under AEDPA, a federal court may not grant habeas relief on any claim adjudicated on the merits in state court unless the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under the "contrary to" clause of § 2254(d)(1), relief may be ordered if the state court arrived at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if the state court decided "a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause of § 2254(d)(1), relief may be awarded if the state court identified the correct governing legal principle from Supreme Court decisions but unreasonably applied that principle to the facts of the case, *id.*, or was "unreasonable in refusing to extend the governing legal

---

3. A certificate of appealability was not required for the Commonwealth's appeal of the ineffective assistance of counsel claim. Fed. R. App. P. 22(b)(3). The District Court granted a certificate of appealability as to the parole ineligibility claim, *Rompilla*, 2000 WL 964750, at *21, and we granted a certificate of appealability as to the accomplice liability instruction claim. 28 U.S.C. § 2253(c).

principle to a context in which the principle should have controlled." *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000). Relief may not be granted under the "unreasonable application" clause merely because the federal court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411. *See also Bell v. Cone*, 122 S. Ct. 1843, 1850 (2002) ("The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one."). Furthermore, a federal court "must presume that the factual findings of both state trial and appellate courts are correct." *Everett v. Beard*, 290 F.3d 500, 508 (3d Cir. 2002) (citing 28 U.S.C. § 2254(e)(1)). This presumption may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III.

Rompilla claims that his trial attorneys were ineffective at the penalty phase. First, Rompilla alleges that his attorneys were derelict in failing to obtain school, hospital, court, and prison records that reveal a number of IQ test results in the mentally retarded range, low achievement scores, placement in special education classes, childhood neglect, problems with alcohol, and an alcoholic mother. Second, he faults his attorneys for failing to provide such records to the psychologist and the two psychiatrists whom they retained to examine him and for allegedly failing to communicate adequately with these experts. Third, he alleges that his attorneys were negligent in interviewing members of his family. He criticizes trial counsel because they did not interview two sisters who did not testify at the penalty phase, and because they did not ask sufficiently specific questions when they interviewed other family members. Fourth, Rompilla charges that his attorneys were derelict in failing to investigate the possible effects on Rompilla of childhood trauma and alcoholism.

## A.

Rompilla was represented by two public defenders, Frederick Charles, who was then the Chief Public Defender for Lehigh County, and Maria Dantos, a full-time assistant public defender. App. 1055-56, 1059. Both testified at length at the PCRA hearing. For present purposes, two aspects of these attorneys' preparation for the penalty phase are most pertinent: first, their efforts to obtain information about Rompilla's childhood and schooling and, second, their communications with the three mental health professionals whom they consulted.

Both Charles and Dantos explained that the defense had questioned Rompilla and numerous members of his family about his childhood, schooling, and background and had asked for any information that might be helpful at sentencing. According to their testimony, however, neither Rompilla himself nor any family member even hinted at the problems on which Rompilla's ineffective assistance claim is based. Dantos testified that she had developed a good relationship of trust with Rompilla, that she felt that she had gotten to know him, and that she had a lot of discussions with Rompilla "about who he was and his life." App. 1073, 1163. When she asked Rompilla about school, Dantos recounted, he told her "[t]hat there was nothing unusual about it." *Id.* at 1197. Dantos also said that she specifically asked Rompilla about drinking and that he responded that he sometimes drank but "could handle it" and was not an alcoholic. *Id.* at 100-01. On the night of the killing, Rompilla told her, he had consumed three or four beers over the course of the entire evening. *Id.* at 1101.

Charles added that Rompilla had responded to questions about his background by saying that nothing was wrong:

> "Is there anything that happened? What was it like growing up? Is there anything you can tell us that could help us?" And he said, "No, there was nothing wrong." He was very, very, smooth about it. It wasn't that he was reluctant to talk about anything. He said, "Your conversations about the possibility of the death penalty bore me." . . .

> There was no indicator from anything he told us that would send us searching for . . . any kind of records. He said everything was fine. He had a normal childhood. There was nothing there. . . .
>
> . . . I remember [Dantos] specifically going one by one and talking to him. 'Is there anything you can tell me? Tell me about yourself. Tell by about your background.' She was, you know, meticulous to cover points.

App. 1303. Both Dantos and Charles said that nothing in their discussions with Rompilla ever suggested that he was mentally retarded, *id.* at 1181, 1393, and Charles elaborated that Rompilla did not have difficulty in understanding what was said to him or in expressing his feelings. *Id.* at 1393.

Dantos and Charles also testified that members of Rompilla's family provided no hint that Rompilla had mental problems, had suffered child abuse, or was an alcoholic. Dantos stated that she spoke with three of Rompilla's siblings, his sister-in-law Darlene Rompilla, and his ex-wife and that she had formed a "very close" relationship with the family. App. 1092, 1065. She said that they had discussed the importance of mitigation evidence but that no one had provided any useful information about Rompilla's background. She testified that she had "spent hours with these family members," that they had "discussed the family dynamics and what [Rompilla's] family relationship was with his parents," and that there was no indication "that there was any sort of abuse within the family." *Id.* at 1097 Likewise, she stated that "there was nothing exceptional presented to [her] about drinking within the family." *Id.* Charles added that although the family members said that they did not know Rompilla well because he had spent so many years behind bars, the family was a "constant source of information." *Id.* at 1303, 1384.

Charles was questioned repeatedly and extensively by Rompilla's attorneys about the failure of the defense to look for school, prison, and medical records, and Charles explained his strategy as follows:

> I would investigate by asking my client, "how was your childhood? Were there any problems that you suffered? Any kind of abuse? . . . [I]s there anything that sticks out? Don't think whether it's important or not. You just tell us, and then we'll determine whether or not we can use it." Investigate it that way. Would I send somebody to the person's elementary school to talk to the teacher to see if they remember him from 25 years or 40 years before. No. I didn't have those resources in the office. . . . I had two investigators and 2,000 cases. . . . I will talk to the client, talk to the family, and see if anything developed from there.

*Id*. at 1293-94. If these inquiries provided any hint that records would be helpful, he added, he would go anywhere to get the records. *Id*. at 1307.

With respect to the development of mitigation evidence regarding Rompilla's mental condition, Charles said that he had sent Rompilla to "the best forensic psychiatrist around here, to [another] tremendous psychiatrist and a fabulous forensic psychologist" and that he relied on them to detect any mental problems that might be useful to the defense and to request that the defense provide them with any records that they might need. App. 1307-08. He elaborated that when he sent Rompilla to the psychologist, he expected the psychologist to administer "a Reitan battery test to determine if there was any brain damage,"[4] a personality test such as "the Minnesota Multiphasic Personality Inventory ("MMPI")",[5] a Rorschach test,[6] and an IQ test. *Id*.

---

4. "The Reitan Battery measures organic impairment by means of a variety of exercises testing concentration, coordination, memory, motor control, abstract abilities and other cognitive and physical functions." *Barker v. Secy of Health and Human Services*, 882 F.2d 1474, 1476 (9th Cir. 1989).

5. The Minnesota Multiphasic Personality Inventory or "MMPI" is "one of the best known and widely used personality assessment tests." Richard Sloane, THE SLOANE-DORLAND ANNOTATED MEDICAL-LEGAL DICTIONARY — 1992 SUPPLEMENT 522 (1992).

6. The Rorschach test is "a projective psychological [test] in which the subject reveals his or her attitudes, emotions, and personality by reporting what is seen in each of 10 inkblot pictures." STEDMAN'S MEDICAL DICTIONARY 1808 (27th ed. 2000).

at 1323. He stated that he also expected that the results of this testing would be available to the psychiatrists. *Id.* If the mental health professionals needed any records or other information, he said, he expected them to ask for them, and he would have tried to provide whatever they sought. *Id.* He said that he also thought that the mental health professionals would interview Rompilla and that they would detect whether Rompilla's denial of anything unusual in his background seemed suspicious. *Id.* at 1308-09.

All three of the mental health professionals to whom Rompilla had been sent by the defense testified at the PCRA hearing either in person or by deposition. All three stated that they had examined Rompilla and had found nothing useful to the defense, but as Rompilla now stresses, all three also testified that, if they had been provided with Rompilla's school and other records, they would have done additional testing.

Dr. Gerald Cooke, an experienced clinical and forensic psychologist, no longer possessed records regarding his examination of Rompilla other than the letter that he had sent to the public defender's office after completing the examination, but he was able to state with "99 percent" certainty what he would have done in a case of that type. App. at 1797. In a death penalty case, he testified that one of the questions in his mind would have been whether the defendant "showed any mental illness, emotional disturbance, or other sorts of problems that might be a psychological mitigating circumstance." App. at 1808. He would have administered an MMPI, "an Incomplete Sentence Blank,[7] the Rorschach inkblot technique, and two or three subtests of the verbal subscale of the Wexler Adult Intelligence WAIS Revised."[8] *Id.* at 1797. Dr. Cooke testified that he knew that the IQ test that he would have administered to Rompilla had not produced a score in the

---

7. The Rotter Incomplete Sentences Blank Test tests maladjustment by providing the beginning of sentences (e.g., "I feel . . .", "My nerves . . .") that are completed by the subject. *See* www.cps.nova.edu/~cpphelp/ROTTER.hrml.

8. The Wechsler Adult Intelligence WAIS Revised is a test that measures general intelligence in adults. STEDMAN'S MEDICAL DICTIONARY, *supra*, 1596.

mentally retarded range because, in that event, he would have given further tests. *Id.* at 1810. He explained that he had not prepared a report regarding his examination because it was his practice to discuss the results of an examination orally with the referring attorney and to leave it to the attorney to decide whether he should prepare a report. *Id.* at 1816. He interpreted the letter that he wrote in this case to mean that he "didn't have anything that [he] felt could be helpful." *Id.*

Dr. Robert Sadoff, an experienced board-certified forensic psychiatrist, also had no records about Rompilla but testified that in a case of that type he would have examined the defendant for competency to stand trial, criminal responsibility, and mitigating circumstances. App. 1841, 1859. He would have questioned and observed the defendant and would have requested psychological testing if he thought it was necessary. *Id.* From the letter that he sent to the Public Defender's Office, he said, it was fair to infer that he had found no mitigating evidence. *Id.* at 1859.

A second psychiatrist, Paul K. Gross, also testified that he had examined Rompilla prior to his trial at the request of the Public Defender's office to determine his mental status at the time but was not asked to look for mitigating factors. App. 1504, 1506, 1549. Dr. Gross stated that Rompilla "denied any abuse as a child, by either parent." *Id.* at 1517. According to Dr. Gross, Rompilla said that he had "a good relationship with his father" and a "fairly normal childhood except for the fact that he didn't like school, which he left in the ninth grade." *Id.* at 1517. Dr. Gross's conclusion at the time was that, although there was some evidence of antisocial behavior, "[t]here was no other evidence for underlying psychiatric or mental disorder." *Id.* at 1540. He added that he did not see anything in the materials shown to him by Rompilla's attorneys at the PCRA hearing that would have changed his opinion. *Id.* at 1539-40. Dr. Gross also reported that although Rompilla denied it, there was a possibility that he could become violent while under the influence of alcohol.

In the PCRA proceedings, Rompilla presented testimony of three family members: two sisters, Barbara Harris and Randi Rompilla, who testified that they were not

interviewed before sentencing, and Nicholas Rompilla, who had testified at the sentencing hearing. These family members stated, among other things, that their parents were alcoholics; that their mother drank while pregnant with Rompilla; that their father was physically abusive to the children and their mother; that Rompilla was locked in an outdoor dog pen; and that Rompilla was told he was stupid and would not amount to anything and was a very nervous child who kept everything inside. Nicholas testified that during the pre-sentencing interview he was asked only about the three months prior to the offense and was not asked about Rompilla's childhood. App. 1462-63, 1467-71, 1477-78.

Rompilla also presented evidence from two psychologists, Carol L. Armstrong and Barry Crown, both of whom had evaluated and tested Rompilla after he was convicted and sentenced. These psychologists' evaluations included neuropsychological testing, review of Rompilla's school, medical, and prison records, and review of post-sentencing declarations by Barbara Harris, Darlene Rompilla, and Nicholas Rompilla. The psychologists stated that the low IQ and achievement test results documented in Rompilla's school records, his medical history, and his abusive background were all "red flags" indicating that further objective evaluation was necessary. App. at 1692, 1739, 1743.

Drs. Armstrong and Crown opined that Rompilla suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions. They expressed the view that Rompilla's problems relate back to his childhood and were likely caused by fetal alcohol syndrome, and they concluded that Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense. *See* Rompilla Br. at 58-61.

### B.

In evaluating Rompilla's ineffective assistance of counsel claim, the PCRA court noted that *Strickland v. Washington*, 466 U.S. 668 (1984), requires proof of deficient performance

and prejudice. App. 2027. The court then observed that Pennsylvania cases employ a three-pronged test:

> First, a defendant must demonstrate that his claim is of arguable merit. In the event this threshold requirement is satisfied, a defendant must show that counsel had no reasonable basis for the act or omission in question. Finally a defendant must establish that but for counsel's act or omission, the outcome of the proceedings would have been different.

App. 2028 (quoting *Commonwealth v. Buehl*, 658 A.2d 771 (Pa. 1995).

Applying this standard, the PCRA court concluded that Rompilla satisfied the first prong because he was "entitled to have relevant information of mental infirmity" presented to the jury, but the court held that the second prong was not met because "counsel had a reasonable basis for proceeding as they did during the penalty phase." App. 2028. The court made the following findings:

- Drs. Cooke and Sadoff, are "recognized experts in the field of psychiatry and psychology."

- "These experts administered tests, evaluated Mr. Rompilla, and reported back to defense counsel."

- They found "no organic brain damage" and "nothing that could be used in mitigation."

- They diagnosed Rompilla as a "sociopath," and this evidence "would not have been of benefit to Mr. Rompilla's case."

- The defense attorneys provided Drs. Cooke and Sadoff "with whatever they asked for," and Drs. Cooke and Sadoff did not request the records later unearthed by PCRA counsel.

- Trial counsel "also obtained an evaluation by Dr. Paul Gross, a well respected Lehigh Valley psychiatrist," and Dr. Gross "found nothing that would have been beneficial in the penalty phase."

- Rompilla did not provide trial counsel with "any indication of mental problems or alcoholic blackouts" or anything else that was "particularly useful."

- Trial counsel "spoke with members of the family in a detailed manner," and the family did not reveal the family background information adduced in the PCRA proceeding.

- The family members' testimony at the PCRA hearing was not credible insofar as it "attempted to contradict what defense counsel indicated was asked of them during numerous communications prior to trial."

App. 2028-2029.

Based on these findings, the PCRA concluded:

- "Given the fact that [the] three health care professionals [retained by trial counsel], all of whom were experienced forensic experts, had provided opinions . . . , and none of them asked for more information, it was hardly unreasonable or ineffective for defense counsel to have relied upon their opinions."

- Trial counsel was not ineffective in questioning family members because family members were questioned "in a detailed manner," and contrary testimony at the PCRA hearing was rejected.

- "Defense counsel was reasonable in believing that the only avenue available to them was to ask the jury to show mercy upon Mr. Rompilla." "Under the circumstances of this case, this strategy was not only an appropriate one, but the only one reasonably available to counsel."

On appeal, the Pennsylvania Supreme Court also held that Rompilla's ineffective assistance claim lacked merit. The Court agreed with the PCRA court "that trial counsel was effective with respect to their investigation and presentation of mitigating evidence." *Rompilla-2*, 721 A.2d at 790. Noting that trial counsel employed three experts to evaluate Appellant" and that "the experts found nothing helpful to Appellant's case," the Court added: "[W]e agree with the PCRA court that under the facts of this case, counsel reasonably relied upon their discussion with Appellant and upon their experts to determine the records needed to evaluate his mental health and other potential mitigating circumstances." *Id.*

In the habeas proceeding, the District Court not only disagreed with the decisions of the PCRA court and the state supreme court on the ineffective assistance issue, but the District Court found that those decisions were unreasonable. *Rompilla*, 2000 WL 964750, at *14. However, the Court stated that its decision was "a very close call . . . because trial counsel performed so admirably according to my review of the record" and further commented that its review of the record revealed that "trial counsel were intelligent, diligent and devoted to their task of representing [Rompilla]." *Id.* at *8, *12.

The District Court found two omissions in the opinions of the PCRA court and the state supreme court. First, the District Court stated, the prior opinions lacked "an in depth analysis of what the duty to investigate consists of in a case of this nature." *Id.* at *8. In particular, the District Court faulted the state courts for failing to "include a reference to the ABA Standards for Criminal Justice." *Id.* Second, the District Court found the state court opinions deficient for failing to discuss alcoholism. *Id.* at *8. Observing that it appeared that trial counsel "thought they could rely on the experts to determine [Rompilla's] general mental ability or capacity," the Court opined: "[I]t seems to me on balance that [trial counsel] were obliged to go a bit farther to fulfill their duty to investigate." *Id.* at *9, *12. Concluding that trial counsel's performance at the penalty phase had been inadequate and that Rompilla had been prejudiced, the Court held that Rompilla was entitled to habeas relief with respect to his sentence. *Id.* at *14.

## IV.

*Strickland* is the Supreme Court precedent governing ineffective assistance of counsel claims, *Williams*, 529 U.S. at 391, and in order to show ineffective assistance under *Strickland*, a defendant must demonstrate (1) that counsel's "representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688; and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "Judicial scrutiny of a counsel's performance must be highly deferential," and

"every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "There is a 'strong presumption' that counsel's performance was reasonable." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). Thus, "a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Bell*, 122 S. Ct. at 1852 (quotations omitted).

"The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is . . . whether what [counsel] did was within the 'wide range of reasonable professional assistance.' " *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc) (quoting *Strickland*, 466 U.S. at 689). Ultimately, the issue is not what conduct is "prudent or appropriate, but only what is constitutionally compelled," *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)), and the Sixth Amendment "simply . . . ensure[s] that criminal defendants receive a fair trial," *Strickland*, 466 U.S. at 689. *See also Kokoralies v. Gilmore*, 131 F.3d 692, 696 (7th Cir. 1997) ("The sixth amendment does not guarantee success or entitle defendants to the best available counsel or the most prudent strategies. . . . [T]he Constitution is satisfied when the lawyer chooses a professionally competent strategy that secures for the accused the benefit of an adversarial trial.")

V.

In this appeal, the Commonwealth contends that the state courts reasonably applied the *Strickland* ineffective assistance standard to the facts of this case. According to the Commonwealth, the District Court erred by essentially considering the ineffective assistance issue as if it were conducting a de novo review — that is, by making its own independent application of the *Strickland* test to the facts rather than considering only whether the state supreme court's application of that test was reasonable. Rompilla of

course disagrees, but he also goes further and argues that we need not reach the unreasonable application issue at all for two reasons: first, because the Pennsylvania Supreme Court did not render a "decision" within the meaning of 28 U.S.C. § 2254(d)(1), and, second, because the state supreme court's decision is "contrary to" *Strickland*. We discuss each of these arguments below.

## A.

Rompilla argues that the Pennsylvania Supreme Court did not render a "decision" on his Sixth Amendment claim because "[t]he Pennsylvania Court's opinion lacks any real Sixth Amendment analysis." Rompilla Br. at 98. Rompilla criticizes the state supreme court for applying the three-pronged test set out in its own cases rather than the two-pronged *Strickland* test. *Id.* He contends that the relationship between the three-part Pennsylvania formulation and the *Strickland* test is "not clear," and he faults that state supreme court for supposedly failing to address either prong of the *Strickland* test. *Id.* at 98-99. He asserts that the state supreme court mistakenly thought that his federal claim was that trial counsel did not conduct any investigation at all, whereas his actual claim was that trial counsel did not conduct a sufficiently "thorough" investigation. *Id.* at 100. Finally, he criticizes the state supreme court for failing "to render a 'decision' at all on critical aspects of this claim," *viz.*, the prejudice prong of *Strickland* and his arguments regarding alcoholism and intoxication. *Id.*

In order to address these arguments, we must first explain the critical difference under the habeas statute between, on the one hand, the failure of a state court to adjudicate a federal claim on the merits (something that may occur if the state court misconstrues the federal claim) and, on the other, the failure of a state court to hand down an opinion that discusses every argument, sub-argument, and legal authority offered by the habeas petitioner. For purposes of the habeas statute, a failure to decide affects the standard of review; a failure to discuss (either at all or to the satisfaction of the habeas petitioner or the federal court) is irrelevant.

Under the habeas statute, as previously noted, if a claim was "*adjudicated on the merits*" in a state court proceeding, relief may not be granted "unless *the adjudication* of the claim . . . *resulted in a decision* that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1)(emphasis added). An "adjudication on the merits" "has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001). *See also Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir. 2001) ("adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural"), *cert. denied*, 123 S. Ct. 963 (2003).

In *Chadwick v. Janecka*, 312 F.3d 597, 605-07 (3d Cir. 2002), *cert. denied*, 123 S.Ct. 1914 (2003), we discussed this issue in detail and reviewed both pertinent Supreme Court precedent and our own prior decisions in *Everett v. Baird*, 290 F.3d 500, 507-08 (3d Cir. 2002), *cert. denied*, 537 U.S. 1107 (2003); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001); and *Hameen v. Delaware*, 212 F.3d 226, 248 (3d Cir. 2000). We noted that under *Weeks v. Angelone*, 528 U.S. 225, 237 (2000), a state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever. *Chadwick*, 238 F.3d at 606. We explained that if an examination of a state court opinion reveals that the state court did not decide a federal claim on the merits, the deferential standards of review set out in § 2254(d)(1) do not apply. *Id.* at 605-07. But if the state court decided the claim, the § 2254(d)(1) standards govern — regardless of the length, comprehensiveness, or quality of the state court's discussion. *Id. See also Sellan*, 261 F.3d at 312 (a state court adjudicates a claim on the merits when it "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment. . . . [e]ven if the state court does not explicitly refer to . . . relevant federal case law."); *Bell v. Jarvis*, 236 F.3d 149, 160 (4th Cir. 2000) (en banc) (section 2254(d) "does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one."), *cert.*

*denied sub nom., Bell v. Beck*, 122 S. Ct. 74 (2001); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) ("The focus is on the state court's *decision* or *resolution* of the case."); *Wright v. Secretary for Dep't of Corrections*, 278 F.3d 1245, 1255 (11th Cir. 2002) (section 2254(d)(1) "focuses on the result, not on the reasoning that led to the result") *cert. denied*, 123 S.Ct. 1511 (2003).

Here, it is abundantly clear that the state supreme court adjudicated Rompilla's Sixth Amendment claim on the merits. Although the state supreme court referred to its own three-pronged ineffective assistance test rather than the two-pronged *Strickland* test, the Pennsylvania Supreme Court has explicitly held that the state standard is "the same" as *Strickland*'s and that Pennsylvania law does not provide "any greater or lesser protection" than the Sixth Amendment. *Commonwealth v. Pierce*, 527 A.2d 973, 976-77 (Pa. 1987). As we put it in *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) *cert. denied*, 532 U.S. 980 (2001), the Pennsylvania Supreme Court has "opined that the Pennsylvania standard judging ineffectiveness claims [is] identical to the ineffectiveness standard enunciated by the United States Supreme Court in *Strickland*." Since the brief filed in the state supreme court on Rompilla's behalf in the PCRA appeal left no doubt that the ineffectiveness claim asserted was based on federal law, it is perfectly clear that the state supreme court adjudicated that federal claim on the merits but simply chose to address the claim within the framework of its own, familiar three-part test, which it regards as "the same" as *Strickland*.

Moreover, it is apparent that this essentially stylistic choice on the part of the state supreme court had no effect on its decision. The state supreme court held that the second prong of the state formulation — requiring a showing that "counsel had no reasonable basis for the act or omission in question," *Rompilla-2*, 721 A.2d at 789 — had not been met because Rompilla's trial "counsel acted reasonably" "with respect to their investigation and presentation of mitigation evidence." *Id.* at 790. The second prong of the state formulation is substantively indistinguishable from the first prong of *Strickland* — which requires a showing that counsel's "representation fell below

an objective standard of reasonableness". *Strickland*, 466 U.S. at 688. Rompilla argues that the significance of the first Pennsylvania prong is unclear[9] and that the third Pennsylvania prong differs from *Strickland*'s prejudice prong,[10] Rompilla Br. at 98-99, but because the state supreme court held that Rompilla failed *the second* state prong, which is indistinguishable from the first *Strickland* prong, these arguments are entirely beside the point.

Rompilla's remaining arguments on the question whether the state supreme rendered an "adjudication" or "decision" on the merits of his federal ineffectiveness claim require little additional discussion. There is plainly no merit to Rompilla's argument that the state supreme court mistakenly thought that his Sixth Amendment claim was that counsel failed to conduct any investigation at all regarding the matters at issue and did not appreciate that his claim was that counsel did not conduct a sufficiently thorough investigation. Although the state supreme court did use the phrase "failed to investigate," 721 A.2d at 790, it seems clear that this was simply a shorthand way of referring to the claim. The court's discussion of the various steps that counsel took and its conclusion that counsel acted "reasonably" make it clear that the court did not think that any investigation at all would suffice but instead understood that the extent of the investigation had to be "reasonabl[e]."

---

9. Rompilla takes exception with the first prong of the Pennsylvania formulations — whether the underlying claim has arguable merit. Although the question of the merit of an underlying claim is not an explicit step under *Strickland*, we have held that it is a determinative factor in the "deficient performance" prong of the *Strickland* analysis in at least some contexts. *See Parrish v. Fulcomer*, 150 F.3d 326, 328 (3d Cir. 1998) (counsel not ineffective for failing to raise meritless claims).

10. Rompilla notes that the third Pennsylvania prong, as stated by the Pennsylvania Supreme Court's opinion, asks whether counsel's act or omission "would have" produced a different outcome, not whether, as stated in *Strickland*, there is a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 694. Since neither the decision of the state supreme court nor our decision in this appeal turns on the issue of prejudice, we have no occasion to explore the question whether in practice prejudice is analyzed differently under these two standards.

What we have said about the relationship between the Pennsylvania formulation of the test for ineffective assistance and the *Strickland* formulation is sufficient to dispose of Rompilla's criticism of the state supreme court for failing to discuss *Strickland* in so many words. Rompilla's criticism of the state supreme court for failing to decide whether the prejudice prong of *Strickland* was satisfied is further flawed because, in light of the state supreme court's holding that counsel's performance was reasonable, the court had no need to address the issue of prejudice. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sistrunk v. Vaughn*, 96 F.3d 666, 673 n.8 (3d Cir. 1996) (if counsel's performance is objectively reasonable, there is no need to decide prejudice).

Finally, Rompilla's complaint that the state supreme court "failed to discuss any aspect" of his arguments regarding evidence of alcoholism and intoxication goes to the style of the state court's opinion, not the question whether the state court rendered an adjudication on the merits. There are many different theories about how judicial opinions should be written. While some opinions make a point of specifically addressing every argument and every significant legal authority offered by counsel, others favor brevity and comment on only those points that the court finds most important. Because the state supreme court in this case rendered an "adjudication on the merits" of Rompilla's Sixth Amendment claim, Rompilla's criticisms of the state court's opinion cannot free him from the restrictive standards of review set out in 28 U.S.C. § 2254(d)(1).

## B.

There is similarly no merit in Rompilla's contention that the decision of the state supreme court was "contrary to" *Strickland* because it did not "identify and apply actual Sixth Amendment standards." Rompilla Br. at 101. A decision is "contrary to" a Supreme Court holding if the state court "contradicts the governing law set forth in [the

Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." *Williams*, 529 U.S. at 405-06.

In this case, the critical standard applied by the state supreme court — whether trial counsel had a "reasonable basis for the act[s] or omission[s] in question" — did not contradict *Strickland* but rather, as we have explained, was entirely consistent with *Strickland*. In *Wertz v. Vaughn*, 228 F.3d at 202-04, as noted, we compared Pennsylvania's ineffective-assistance test with the test enunciated in *Strickland*, and we found that a state court decision that applied the Pennsylvania test did not apply a rule of law that contradicted *Strickland* and was thus not "contrary to" established Supreme Court precedent. *Id.* at 204. In the instant case, the state court applied the same state test. Accordingly, here, as in *Wertz*, the state court's application of that test does not mean that its decision is "contrary to" established Supreme Court precedent.

Rompilla also argues that the state court decision is contrary to *Strickland* because counsel's failure to obtain records, without knowing the contents of the records, "*cannot* be deemed a reasonable strategy/tactic, *as a matter of Sixth Amendment law*," and because "Sixth Amendment law does *not* condition [the] obligation [to obtain records] in any way on counsel's duties with regard to expert evaluations." Rompilla Br. at 106, 108 (emphasis in original). Rompilla is essentially challenging the manner in which the state court applied the law to the facts, and thus this argument must be analyzed under the "unreasonable application" clause of § 2254(d)(1). *See Williams*, 529 U.S. at 406 (a "run-of-the-mill state court decision" that is "in accord with . . . *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim . . . may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case" but is not contrary to *Strickland* itself). For these reasons, we reject Rompilla's arguments under the "contrary to" clause of § 2254(d)(1).

## VI.

We now turn to the 'unreasonable application' clause of § 2254(d)(1). To obtain relief under this clause, Rompilla

> must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Bell*, 122 S. Ct. at 1852 (citation omitted). In other words, Rompilla must demonstrate that "the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under *Strickland*." *Wertz*, 228 F.3d at 204.

We hold that the Pennsylvania Supreme Court's conclusion that trial counsel acted reasonably and rendered effective assistance was not an unreasonable application of *Strickland*. The findings of the PCRA court and uncontradicted testimony at the PCRA hearing establish that trial counsel conducted an extensive investigation for mitigating evidence. According to their testimony, trial counsel got to know Rompilla well during the course of their representation and established a good relationship with him. Rompilla was questioned about his background but provided no useful information or leads. Trial counsel also spoke to three of Rompilla's siblings, as well as a sister-in-law and Rompilla's ex-wife. Family members were questioned "in a detailed manner," but they did not allude to any of the new evidence adduced at the PCRA proceeding.

Trial counsel retained three well-qualified mental health experts to examine Rompilla. Dr. Cooke, a psychologist, testified that in a case of this type he would have looked for mitigating evidence and would have performed a battery of tests, including an IQ test. Based on his letter to the Public Defender's office, he concluded that Rompilla's IQ test must not have shown mental retardation and that his evaluation must not have revealed any abnormalities that would have

been useful in showing mitigation. Dr. Sadoff, a psychiatrist, interviewed Rompilla and evaluated him for the presence of mitigating factors, but Dr. Sadoff inferred that he also found nothing useful. A second psychiatrist, Dr. Gross, was also retained but similarly found nothing useful. In view of this record, we cannot say that the Pennsylvania Supreme Court unreasonably applied *Strickland* in concluding that trial counsel's investigation regarding mitigating evidence relating to Rompilla's family background and mental condition did not fall below the Sixth Amendment floor.

Rompilla criticizes many aspects of trial counsel's performance at the penalty phase, but we see no ground for relief under the habeas statute. Rompilla faults his trial attorneys for failing to interview two sisters who testified at the PCRA hearing — Barbara Harris, the oldest of Rompilla's siblings, and Randi Rompilla, the second youngest. But trial counsel did interview three other siblings, including two who were a few years older than Rompilla (Nicholas Rompilla and Sandra Whitby) and one Robert Rompilla, who was younger. At least some of the siblings who were interviewed must have been aware of the lurid conditions in the family home that were portrayed at the PCRA hearing, but they never mentioned anything about these matters to trial counsel despite being interviewed "in a detailed manner." It was thus not constitutionally ineffective for trial counsel to fail to anticipate that interviewing Barbara Harris or Randi Rompilla would have yielded important new information about the family home.

Rompilla also criticizes his trial attorneys for allegedly failing to ask sufficiently specific questions when interviewing family members and for allegedly failing to ask Nicholas Rompilla about any time period other than the three and one-half months just before the murder. This argument is defeated by findings of fact made by the state courts. The PCRA found that trial counsel "spoke with members of the family in a detailed manner." App. 2028. The PCRA court also rejected Nicholas Rompilla's testimony insofar as it contradicted "what defense counsel indicated was asked . . . during numerous conversations prior to

trial." *Id.* at 2030. Testimony at the PCRA hearing supports these findings. *See, e.g., id.* at 1303 ("I remember [Dantos] specifically going one by one and talking to him. 'Is there anything you can tell me? Tell me about yourself. Tell by about your background.' She was, you know, meticulous to cover points."). The state courts' findings must be presumed to be correct, and Rompilla has not rebutted that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). We accordingly reject Rompilla's argument regarding the interviewing of family members.

Rompilla contends that trial counsel should have sought out school, medical, police, and prison records, but this argument also falls short of meeting the AEDPA standard. With the benefit of hindsight, we know that these records contain useful information about Rompilla's childhood home environment, his mental problems, and his problems with alcohol, but trial counsel had grounds for believing that if there was any mitigating evidence of this sort to be found, at least a hint of its availability would be disclosed in the interviews with Rompilla and his family members or in the testing and evaluations performed by the three mental health experts whom they retained.

Charles, the lead trial attorney who had the final say on every issue in the case, App. 1258, explained why these records were not sought out. He testified that he would have done whatever was needed to get records if there had been any indication from the interviews or from the information provided by the mental health experts that such records would be helpful. *Id.* at 1307. But since these interviews and evaluations suggested that Rompilla's home environment, schooling, and mental condition were not promising avenues of investigation in the search for mitigating evidence, he did not think that obtaining those records would have represented a sound allocation of his office's resources. *Id.* at 1293-94.

This explanation provides a reasonable basis for counsel's decision not to seek the records. Defense counsel was permitted to rely on statements made by their client in deciding on the extent of the investigation that should be conducted in particular areas. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be

determined or substantially influenced by the defendant's own statements or actions."); *id.* ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."). As noted counsel's interviews with Rompilla himself and with family members provided no indication of Rompilla's abusive childhood or mental problems. *See Thomas*, 144 F.3d at 515 ("if the client and his family and friends throw the lawyer off the scent . . . by denying the existence of psychological problems that might have provided an alternative theory of mitigation, the lawyer cannot be faulted for failing to go down the path thus closed off"). "The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued. [Although] it does require a reasoned judgment as to the amount of investigation the particular circumstances of a given case require[,] [a]n attorney need not fully investigate every potential avenue if he or she has reasonable grounds for not doing so." *Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996). *See also Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) ("A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct.") *cert. denied*, 525 U.S. 1123 (1999).

It was likewise not unreasonable for trial counsel to rely on its mental health experts to detect whether there was any basis for further pursuit of mitigating evidence relating to their client's mental condition. Trial counsel retained no fewer than three highly qualified experts. Dr. Cooke and Dr. Sadoff looked for any evidence that could be used as mitigation but found none. A battery of tests was performed but yielded no indication of mental retardation or anything else that would have been useful for mitigation. Although all three of the experts testified that the records that PCRA counsel subsequently obtained would have caused them to do further investigation, none of the experts asked for records or suggested that any further testing be done.

In view of these circumstances, it was not unreasonable

for the state courts to conclude that trial counsel did not fall below the constitutionally mandated level of representation by failing to search out the records at issue and by failing to provide those records to their mental health experts. This was not a case where counsel knew of the defendant's mental health or other problems and failed to inform or provide the experts with the information. *See Caro v. Calderon*, 165 F.3d 1223, 1228 (9th Cir. 1999) ("A lawyer who knows of but does not inform his expert witnesses about . . . essential pieces of information going to the heart of the case for mitigation does not function as 'counsel' under the Sixth Amendment.") *cert. denied, sub nom, Woodford v. Caro*, 527 U.S. 1049 (1999). Despite counsel's attempts to find out otherwise, counsel had no knowledge of Rompilla's problems and/or childhood abuse.[11]

In *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990), the court addressed an argument very similar to Rompilla's argument regarding trial counsel's failure to provide records to their mental health experts. In *Card*, a capital case, the mental health expert spoke to members of the defendant's

---

11. For this reason, the authority cited by Rompilla is inapposite. *See Jermyn*, 266 F.3d at 275 (counsel knew that expert was willing to testify regarding defendant's abusive childhood and its mitigating effects on the defendant's adult life); *Profitt v. Waldron*, 831 F.2d 1245, 1246-49 (5th Cir. 1987) (counsel knew defendant escaped from mental hospital shortly before the crime); *Beavers v. Balkcom*, 636 F.2d 114, 115-16 (5th Cir. 1981) (counsel knew of defendant's prior hospitalization in mental institution); *Glenn v. Tate*, 71 F.3d 1204,1208 (6th Cir. 1995) (counsel knew defendant had received mental health counseling) *cert. denied*, 519 U.S. 910 (1996); *Antwine v. Delo*, 54 F.3d 1357, 1365-66 (8th Cir. 1995) (counsel knew that defendant was acting "odd" prior to the offense) *cert. denied sub nom, Bowersox v. Antwine*, 516 U.S. 1067 (1996); *Hill v. Lockhart*, 28 F.3d 832, 838-40, 845 (8th Cir. 1994) (counsel knew of defendant's prior hospitalization); *Kenley*, 937 F.2d at 1300, 1304-06 (counsel knew of but failed to contact a doctor who had previously treated the defendant); *Clabourne v. Lewis*, 64 F.3d 1373, 1377, 1388 (9th Cir. 1995) (counsel knew defendant was mentally impaired at the time of the offense, and had "display[ed] a broad spectrum of psychiatric and emotional disorders"); *Wallace v. Steward*, 184 F.3d 1112, 1114, 1116 (9th Cir. 1999) (counsel knew from first sentencing hearing of defendant's "chaotic upbringing," substance abuse, and mother's mental illness) *cert. denied*, 528 U.S. 1105 (2000).

family and was provided copies of pre-trial reports indicating that the defendant was competent to stand trial. *Id.* at 1512. The expert testified at the sentencing hearing that the defendant suffered from a sociopathic personality disorder and that his abusive childhood was consistent with the development of the disorder. *Id.* at 1508. The defendant claimed that counsel was ineffective in failing to provide the expert with various school, incarceration, army, and medical records and information from family members. *Id.* at 1512. This information, the defendant argued, would have enabled the expert to diagnose the defendant as suffering from organic brain damage and schizophrenia, rather than merely a sociopathic personality. *Id.* at 1512-13. The Eleventh Circuit rejected this argument observing that

> [t]here is no indication that the experts felt incapable of basing their conclusions on the information they obtained through their own testing and examinations. Nor is there any reason that, after receiving the experts' reports, counsel was obligated to track down every record that might possibly relate to [the defendant's] mental health and could affect a diagnosis.

*Id.* at 1512.

We find this reasoning persuasive. As in *Card*, there was no indication in the present case that Drs. Cooke, Sadoff, and Gross "felt incapable of basing their conclusions on the information they obtained through their own testing and examinations." *Card*, 911 F.2d at 1512. Thus, it was not unreasonable for counsel to rely on the expertise and experience of the mental health professionals in determining the need for any records. Such deference to the legitimate role of experts is well within the wide range of reasonable professional assistance.

Furthermore, it was permissible for Charles to consider his office's limited investigative resources in determining the extent of the investigation that should be conducted with respect to Rompilla's childhood, family, and mental condition. *See McWee v. Weldon*, 283 F.3d 179, 188 (4th Cir. 2002) ("the reasonableness of an investigation . . .

must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing"), *cert. denied*, 537 U.S. 893 (2002); *Mahaffey v. Page*, 151 F.3d 671, 685 (7th Cir.) ("A 'reasonable investigation' does not mandate a 'scorch-the-earth strategy,' a requirement that would fail to consider the limited time and resources that defense lawyers have in preparing for a sentencing hearing.") (citations omitted), *vacated in part on other grounds*, 162 F.3d 481 (7th Cir. 1998); *Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994) (the focus on whether a decision not to conduct a particular investigation was reasonable "reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources").

Rompilla argues that his trial attorneys were deficient because they did not provide adequate information or instructions to Drs. Cooke, Sadoff, and Gross. Rompilla maintains that his attorneys should have instructed Dr. Cooke to test for brain damage, but Charles testified that he relied on the experts to do whatever testing was appropriate. App. 1307-08. Dr. Cooke was aware of the need for mitigating evidence. He testified that in a capital case he would have looked for indications of "any mental illness, emotional disturbance, or other sorts of problems that might be a psychological mitigating circumstance," and he performed the battery of tests that he felt was called for. *Id.* at 1808-09. He stated that if the results of some of those tests had provided a reason to do a "neuropsyche test," he would have done so. *Id.* at 1809. Thus, Rompilla is in effect faulting his trial attorneys for failing to instruct an expert to do a test that the expert apparently did not think was warranted under the circumstances. This argument demands much more than the Sixth Amendment requires.

Rompilla criticizes his trial attorneys for allegedly failing to educate Dr. Sadoff about the meaning of mitigating evidence. Based on a snippet of Dr. Sadoff's testimony, Rompilla suggests that Dr. Sadoff thought that "mitigating evidence was *limited* to evidence *about the offense* itself," Rompilla Br. at 87 (citing App. 1874), whereas under the law, "mitigation is anything that 'might serve as a basis for a sentence less than death' and need 'not relate specifically

to [the defendant's] culpability for the crime he committed.'" Rompilla Br. at 88 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986)) (emphasis and brackets in original). There are at least three weaknesses in this argument.

First, in light of Dr. Sadoff's background — which included extensive experience relating to the criminal justice system (*see* App. 1876-1892) — it is far from clear that trial counsel had a constitutional obligation to brief him on the meaning of exculpatory evidence.[12] Second, it also is not clear that Rompilla's argument accurately represents what Dr. Sadoff said. Asked by Rompilla's PCRA attorney whether he thought that evidence was mitigating only "if it relates to the defendant's state of mind at the time of the commission of the offense," Dr. Sadoff answered: "It relates to that *and the kind of person he is* . . . ." App. 1874. (emphasis added). He continued that in the past he had not "used irrelevant material that had nothing to do with the crime itself as a mitigating factor. It had to be something that would have impacted on [the defendant's] state of mind at the time." *Id.* Thus, Dr. Sadoff did not say that he thought that mitigating evidence *had to be* evidence "about the offense." Rompilla Br. at 87 (emphasis in original removed). Rather, he said that the mitigating evidence that he had used in the past was evidence of something that had an impact on the defendant's mind at the time. App. at 1874. It is not apparent that mental health evidence is likely to be persuasive for mitigation purposes if it cannot have had any impact on a murderer's mind at the time of offense.

---

12. Both Drs. Sadoff and Cooke had previously testified in criminal proceedings. *See, e.g.*, *United States v. Green*, 544 F.2d 138, 144 (3d Cir. 1976) (Sadoff and Cooke); *New Jersey v. Zola*, 548 A.2d 1022, 1030 (N.J. 1988) (Sadoff and Cooke); *Commonwealth v. Comitz*, 530 A.2d 473, 603-04 (Pa. Super. Ct. 1987) (Sadoff); *Commonwealth v. Stark*, 526 A.2d 383 (Pa. Super. Ct. 1987) (Sadoff). They had also previously testified in capital cases. *See, e.g.*, *New Jersey v. Pitts*, 562 A.2d 1320, 1325-27 (N.J. 1989) (Sadoff and Cooke); *Commonwealth v. Aulisio*, 522 A.2d 1075, 1087 (Pa. 1987) (Cooke); *Commonwealth v. Terry*, 521 A.2d 398, 405, 409 (Pa. 1987) (Cooke); *Commonwealth v. Whitney*, 512 A.2d 1152, 1157 (Pa. 1986) (Cooke); *Commonwealth v. Terry*, 462 A.2d 676 (Pa. 1983) (Sadoff and Cooke).

Third and most important, even assuming for the sake of argument that Dr. Sadoff's understanding of the range of mental health evidence that can be mitigating was unduly narrow, we see absolutely no reason to believe that Dr. Sadoff's understanding contributed in any way to his failure to detect the conditions that Rompilla now claims. Rompilla argues that he "suffers from organic brain damage, including damage to the frontal lobes and parietal area" and that these impairments, among other things, prevent him from "adequately control[ling] and guid[ing] his behavior," "emotions," and "impulses." Rompilla Br. at 58. He argues that these conditions "substantially impair[ ] his capacity to appreciate criminality of conduct or conform conduct to the requirements of law." *Id*. at 96. Accordingly, these impairments surely would have "impacted" his mind at the time of the Scanlon murder and thus fall squarely within the scope of the sort of mitigating evidence to which Dr. Sadoff referred.

Rompilla argues that his trial attorneys were ineffective because they did not ask Dr. Gross to look for mitigating evidence. Rompilla Br. at 65 (citing App. 1535-36, 1545). However, Drs. Cooke and Sadoff did look specifically for mitigating evidence, and the scope of Dr. Gross's evaluation encompassed at least some mitigating evidence. He stated: "I was looking to see if he knew what he was doing, whether he was suffering from any kind of psychiatric disorder, whether he may have been intoxicated, exactly what his emotions and cognitive processes were." App. 1506. In light of what Drs. Cooke and Sadoff were asked to do and in fact did, trial counsel's instructions to Dr. Gross do not show that trial counsel were ineffective.

Finally, Rompilla argues that trial counsel were ineffective in failing to do further investigation relating to Rompilla's alcohol use. Rompilla never explains exactly what alcohol-related mitigation argument he believes his trial attorneys should have made, but he refers to information suggesting that there is a history of alcohol-abuse in the Rompilla family, that he is an alcoholic, that his alcoholism was caused by his traumatic childhood, that he suffers from alcohol-induced blackouts, and that he was intoxicated on the night of the murder. While these

elements can be woven into an attractive mitigation argument, most of the elements are based on information in the records that trial counsel was not, for the reasons we have explained, constitutionally obligated to obtain. This includes evidence of drinking in the Rompilla family, Rompilla's abusive childhood home, blackouts, and Rompilla's alcoholism.

The only alcohol-related mitigation argument that trial counsel could have made without obtaining the previously discussed records — namely, that Rompilla was so intoxicated at the time of the Scanlon murder that his judgment was impaired — would not have been particularly compelling. Moreover, while evidence to support this argument was available,[13] the argument would have to have been made without the support of testimony from Rompilla, who did not take the stand at either phase of the trial and denied intoxication or alcohol problems. We cannot say that it was objectively unreasonable for trial counsel not to put on such a defense.

Finally, Rompilla argues that the Supreme Court's recent decision in *Wiggins v. Smith*, 123 S.Ct. 2527 (2003), shows that his trial attorneys conducted an unreasonably abbreviated investigation of potential mitigating factors, but there is a sharp contrast between the conduct of the attorneys in *Wiggins* and those in this case. In *Wiggins*, the trial attorneys claimed that they made a tactical decision not to present mitigating evidence but instead to pursue the alternative strategy of attempting to prove that someone other than the defendant actually killed the victim. *Id.* at 2533. Accordingly, they made little effort to investigate the defendant's background although they had reason to believe that such an investigation would have been fruitful.

The Supreme Court found that defense counsel's investigation of their client's background was based entirely on the presentence investigation report (PSI) and documents from the Baltimore City Department of Social Services (DSS). *Id.* at 2540. Although funds were available

---

13. As Rompilla points out, police reports on the Scanlon case indicated that "Rompilla was drinking heavily and was intoxicated and incoherent around the time of the offense." Rompilla Br. at 92.

for the preparation of a social history of the defendant, counsel did not commission such a report. *Id.* at 2536. But even the limited documents that counsel reviewed contained information that should have alerted counsel that an expanded investigation into their client's background was likely to yield mitigation evidence. The PSI reported that the defendant had spent most of his childhood in foster care and quoted the defendant as describing his background as "disgusting." *Id.* at 2536. The DSS records disclosed that the defendant's "mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." *Id.* at 2537.

Wiggins's trial counsel nevertheless failed to follow these leads. Counsel moved for bifurcation of the penalty phase trial so that they could first attempt to show that their client did not kill the victim by his own hand and then, if that defense was rejected, offer evidence in mitigation. *Id.* at 2532. When bifurcation was denied, defense counsel made a brief reference in her penalty phase opening to the defendant's "difficult life" but "introduced no evidence of [his] life history." *Id.* And although counsel proffered some evidence that would have been introduced if the bifurcation had been allowed, no evidence of the defendant's life history or family background was included. *Id.* After the defendant was sentenced to death, new counsel commissioned the preparation of a social history. *Id.* at 2532. A social worker interviewed Wiggins and family members, obtained additional documents, and compiled evidence of severe physical and sexual abuse by Wiggins's mother. *Id.* at 2532, 2542.

Faced with these facts, the Supreme Court held that it was objectively unreasonable for counsel not to conduct a further investigation for mitigating evidence regarding Wiggins's background. *Id.* at 2541. The Court stated that "any reasonably competent attorney" would have realized that it was necessary to follow the leads in the PSI and DSS documents before making a choice among potential defenses. *Id.* at 2537. The Court stressed that "counsel

uncovered no evidence in their investigation to suggest that . . . further investigation would have been fruitless." *Id.* The Court also emphasized that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Id.* Instead, the Court reiterated that "[a] decision not to investigate . . . 'must be directly assessed for reasonableness in all the circumstances.'" *Id.* (quoting *Strickland*, 466 U.S. at 691).

There are critical differences between the conduct of Wiggins's and Rompilla's trial attorneys. Wiggins's attorneys were presented with leads that "any reasonably competent attorney" would have realized were promising. Rompilla's attorneys had no comparable leads. Wiggins described his childhood as "disgusting"; Rompilla insisted that his was "normal." In *Wiggins*, postconviction interviews with Wiggins himself and with members of his family produced evidence of severe abuse. 123 S.Ct. at 2542. In the present case, Rompilla's attorneys interviewed their client and numerous family members in detail before the penalty proceeding but discovered no mitigating evidence. Wiggins's attorneys "uncovered no evidence in their investigation to suggest that . . . further investigation would have been fruitless." *Id.* at 2537. Rompilla's trial attorneys had a body of evidence that suggested that a further investigation into Rompilla's family background would not have been productive. Not only did Rompilla's attorneys probe their client for mitigating evidence, but they interviewed numerous members of his family, including siblings who bracketed him in age. At least one of these siblings, Nicholas Rompilla, later revealed that he knew about the conditions in the home on which Rompilla now relies, but he never provided that information to trial counsel, and although he now claims that trial counsel never asked him about any period of time other than the months immediately preceding the murder, the PCRA court found that this testimony was not believable.

In short, the attorneys in *Wiggins* did little to investigate their client's background although they possessed information that should have prompted them to do so. Rompilla's attorneys conducted a much greater

investigation, but their interviews with their client and his family provided a reasonable basis for concluding that additional investigation would not have represented a wise allocation of limited resources. In our view, *Wiggins* is critically different from the present case.

Rompilla asserts that Dr. Gross's report "explicitly recommend[ed] that counsel investigate alcoholism," Rompilla Br. at 66, but this is not exactly what Dr. Gross wrote. Dr. Gross said that "[t]he possibility does remain . . . that Mr. Rompilla while under the influence of alcohol, can become prone to violent behavior although he himself strongly denies this." Dr. Gross added: "My recommendation is that this area should be further evaluated *before any definitive conclusions are drawn.*" (emphasis added). Thus, Dr. Gross did not say that further evaluation was likely to produce evidence that Rompilla becomes violent when drunk, only that this was a "possibility." Nor did he recommend further evaluation as a promising strategy for the defense. Instead, he merely said that "no definitive conclusions" should be drawn about this possibility unless there was a further evaluation. And finally, it should be noted that he referred to a further "evaluation" (a term that suggests a psychiatric examination), not an "investigation." Rompilla's brief repeatedly uses the term "investigate" in an apparent attempt to suggest that Dr. Gross recommended that trial counsel search for evidence such as the records discussed above. The use of this term obscures the fact that trial counsel did precisely what Dr. Gross recommended: they had Rompilla "evaluated" further, i.e., examined by another psychiatrist, Dr. Sadoff.

In conclusion, it appears to us that Rompilla is now arguing that his trial counsel were constitutionally derelict in failing to take all the steps that might have been pursued by the most resourceful defense attorneys with bountiful investigative support. But while we may hope for the day when every criminal defendant receives that level of representation, that is more than the Sixth Amendment demands. *See Strickland,* 466 U.S. at 689 ("the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation,

although that is a goal of considerable importance to the legal system"); *Burger*, 483 U.S. at 794 ("The record at the habeas corpus hearing does suggest that [counsel] could well have made a more thorough investigation than he did. Nevertheless, in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.' ") (quoting *Cronic*, 466 U.S. at 665 n.38) (alteration in original). The Sixth Amendment is satisfied when "counsel's conduct falls within the wide range of reasonable professional assistance," thereby "ensur[ing] that criminal defendants receive a fair trial." *Strickland*, 466 U.S. at 689.[14]

---

14. In finding the state courts' analysis unreasonable, the District Court relied in part on the absence of any "in depth analysis" of the duty to investigate, including the lack of any reference to the ABA Standards for Criminal Justice. *Rompilla*, 2000 WL 964750, at \*9. Three important observations must be made about the District Court's treatment of this point. First, the state court's failure to *discuss* these standards does not mean that the standards themselves or the principles they embody were not considered. Second, we see nothing in the quoted portions of the ABA standards that dictates that records of the sort at issue here must always be sought. Third, although the ABA standards are important guides, they cannot be viewed as a codification of the requirements of the Sixth Amendment. In *Strickland*, the Supreme Court recognized that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are *guides* to determining what is reasonable." *Strickland*, 466 U.S. at 688 (emphasis added). *See also Williams*, 529 U.S. at 396. However, the Supreme Court has made it clear that the ABA standards

> are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. . . . [T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

*Strickland*, 466 U.S. at 688-89 (citation omitted). *See also Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) (the Court has "consistently declined to impose mechanical rules on counsel — even when those rules might lead to better representation").

*See also Waters*, 46 F.3d at 1512 ("The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.") (quoting *White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992)). Here, the state court's determination that counsel acted reasonably was not "contrary to" or an "unreasonable application" of *Strickland*.

## VII.

Rompilla advances three claims related to the trial court's response to the jury's questions about accomplice liability. First, Rompilla argues that his federal constitutional right to due process was violated because the court instructed the jury on accomplice liability without providing "notice or fair warning that he might be subjected to liability as an accomplice." Rompilla Br. at 14. Second, he contends that his federal constitutional right to due process was abridged because the accomplice-liability comments did not state that "accomplice liability must be proven beyond a reasonable doubt and that conviction for murder, even based on accomplice liability, required proof of a specific intent to kill." *Id.* at 20. Third, he maintains that his rights under the Sixth, Eighth, and Fourteenth Amendments were violated because the trial judge's remarks prevented the jury "from considering and giving exculpatory and mitigating effect to evidence that someone other than Rompilla was the killer." *Id.* at 22 (emphasis in original removed).

## A.

Under 28 U.S.C. § 2254(b)(1), a state prisoner's application for a writ of habeas corpus "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State" or the case falls within one of two exceptions to the exhaustion requirement, i.e., "there is an absence of available State corrective process" or "circumstances exist that render such

process ineffective to protect the rights of the applicant." Moreover, under 28 U.S.C. § 2254(b)(3), a state may not be deemed to have waived exhaustion or be estopped from relying on exhaustion "unless the State, through counsel, expressly waives the requirement." In order to exhaust state remedies, a habeas petitioner must present the petitioner's federal claim in the state courts. *See Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001). It is not enough for a petitioner to advance a similar state-law claim. *Duncan v. Henry*, 513 U.S. 364, 366 (1995). Rather, a petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).

Three sections of Rompilla's brief on direct appeal to the state supreme court raised claims concerning the accomplice liability instruction. First, Rompilla argued that the judge erred in giving the instruction because the defense had no prior notice that this theory of liability was in the case and because the judge refused a defense request that "the jury be specifically instructed that under an accomplice theory every element must be proven beyond a reasonable doubt." Appellant's Br. at 11, *Commonwealth v. Rompilla*, Supreme Court of Pennsylvania, Philadelphia District, No. 53 Capital Appeal Docket (hereinafter "Rompilla Direct Appeal Br."). Although this section of Rompilla's brief did refer to the requirement of proof beyond a reasonable doubt — something demanded by both the federal Constitution and Pennsylvania law[15] — the brief made no reference to the federal Constitution and did not cite any federal authorities. Second, Rompilla argued that the judge erred in refusing to poll the jury as to whether the guilty verdict was based on the theory of accomplice liability. Rompilla Direct Appeal Br. at 15-17. This contention was based exclusively on state law. Third, Rompilla repeated the argument that the trial judge erred in refusing to give the requested defense instruction to the effect that conviction as an accomplice required proof beyond a reasonable doubt. *Id.* at 17-18. Only state authorities grounded on state law were cited.

---

15. *See Commonwealth v. Bonomo*, 151 A2d 441, 446 (Pa. 1959).

Based on our examination of Rompilla's brief to the Pennsylvania Supreme Court, it is not clear that Rompilla properly presented any federal constitutional claim to that court.[16] Moreover, even if Rompilla's brief to the state supreme court is read as having raised the federal claim that the trial judge erred in refusing to give the requested instruction on the requirement of proof beyond a reasonable doubt, it seems clear that the remaining federal constitutional claims advanced by Rompilla in this appeal were not presented to the state supreme court. Rompilla's argument in the state supreme court concerning the lack of prior notice was based solely on state authorities, and the argument that Rompilla has made to us that the trial judge's instruction effectively prevented the jury from considering exculpatory and mitigating evidence was never made, either as a state- or federal-law claim, in Rompilla's direct appeal brief.

In view of these deficiencies, if Rompilla could still return to the state courts and present the federal constitutional claims that he has made here, we would probably be obligated to regard those claims as unexhausted. It is clear, however, that Rompilla can no longer raise those claims in state court, 42 Pa. Cons. Stat. Ann. § 9545(b), and therefore it appears that those claims are exhausted but are probably procedurally defaulted. *See Fahy v. Horn*, 240 F.3d 239, 245 (3d Cir. 2001). The Commonwealth has not raised the defense of procedural default, but we have the discretion to do so in appropriate circumstances. *See Sweger v. Chesney*, 294 F.3d 506, 520 (3d Cir. 2002) *cert. denied*, 123 S.Ct. 1902 (2003). Nevertheless, we do not rely on the doctrine of procedural default in deciding this appeal. Assuming for the sake of argument that our consideration of those claims on the merits is not barred, we find that the claims do not provide a basis for habeas relief.

16. On direct appeal, the state supreme court described Rompilla's argument as follows:

> by being instructed on an accomplice theory and then being told to disregard it, the jury might have been confused and convicted [Rompilla] as an accomplice.

*Rompilla-1*, 653 A.2d at 631.

## B.

When language in jury instructions is challenged, the language in question "must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). We then consider " 'whether there is a *reasonable likelihood* that the jury has applied the challenged instructions in a way' that violates the Constitution." *Smith v. Horn*, 120 F.3d 400, 411 (3d Cir. 1997) (quoting *McGuire*, 502 U.S. at 72.)) Under these standards, the trial judge's comments about accomplice liability did not violate Rompilla's constitutional rights.

## 1.

Since there were no eyewitnesses to the killing, the Commonwealth's case was based almost entirely on the previously noted circumstantial evidence. *See Rompilla-1*, 653 A.2d at 629. The defense argued that someone other than Rompilla was the actual assailant.

During jury deliberations in the guilt phase, the jury asked:

> If Defendant was an accomplice to the Charge of Criminal Homicide, can he be charged with Murder in the First Degree?

App. at 585. In response, the trial judge began by informing the jury that the Commonwealth had not proceeded on the theory that Rompilla was liable for the murder as an accomplice and that no instruction on accomplice liability had been given. The judge stated:

> Well, preliminarily, let me say this. If you recall, *the Court, in [its] Charge, at no time referred to any theory of accomplice in this case. It is not the Commonwealth's theory in this case that the Defendant was an accomplice.* I'm not quite sure what prompted the question. If it arose because of something that was argued by Counsel in the closing speeches, if you recall, I indicated that you are to give — and you should be guided by each Lawyer's arguments to the extent they're supported by the evidence and in so far as they aid you in applying your own reason and

common sense. However, you are not required to accept the arguments of either Lawyer. It is for you alone — you and you alone to decide this case based on the evidence as it was presented from this witness stand and in accordance with the instruction which the Court gave you. Now, again, as I say, I'm not quite sure what prompted the question, but you did ask the question, and I assume you want an answer, is that correct?

*Id.* at 585-86 (emphasis added). The jury foreman nodded in the affirmative, and the trial court then attempted to explain when an accomplice could be held liable for a crime committed by another. *Id.* at 586-87. The court concluded, however, with the following comments:

I can only say this to you, that *you should determine this case based on the Charge of the Court as it had given you originally*. There was no evidence in this case with regard to the question as posed but a simple clear answer to the question is yes, you could be charged with, and you could be convicted of Murder in the First Degree if, indeed, you're an accomplice, but *it requires other proof or findings on your part that were not a part of this case nor were they made a part of this case, all right*.

*Id.* at 587-88 (emphasis added).

On direct appeal, the state supreme court did not decide whether the trial judge's comments about accomplice liability were flawed but instead held that any error was cured by the judge's admonition to the jury that it should not consider that theory of liability. *Id.*[17] The District Court

17. In the PCRA appeal, Rompilla again attempted to challenge the trial judge's instruction on accomplice liability, but the state supreme court held that relief was unavailable because the claim had already been litigated on direct appeal. *Commonwealth v. Rompilla*, 721 A.2d 786, 793 (Pa. 1999).

In the federal habeas proceeding, the District Court also found that the instruction did not prevent consideration of exculpatory and mitigating evidence and that Rompilla's claim that there was evidence of an accomplice was not supported by the record. *Id.*

— presented with arguments notably different from those advanced in the state supreme court — went beyond the state supreme court in holding that the judge's explanation of accomplice liability was incomplete, but the District Court agreed with the state supreme court that any flaw was cured by the trial court's admonition that the theory of accomplice liability was not before the jury in this case. *Rompilla*, 2000 WL 964750, at *14. Similarly, we conclude that, even assuming *arguendo* that the challenged comments were constitutionally flawed, there is no basis for habeas relief. The state supreme court's decision that any defect in the challenged comments was cured by the judge's admonition that the jury was not to consider the theory of accomplice liability did not "involve an unreasonable application of Federal law," 28 U.S.C. § 2254(d)(1), namely, the rule that jury instructions do not violate the Constitution unless there is a reasonable probability that they were applied in a way that abridged constitutional rights. Moreover, even under a standard of plenary review, we would find no constitutional violation.

Here, the clear thrust of the trial court's response to the jury's question was that the Commonwealth was not relying on the theory that Rompilla was liable as an accomplice and that the jury should not consider that theory as a possible basis for conviction. As noted, when the judge first responded to the jury's question, the judge began by reminding the jury that the court's instructions "at no time referred to any theory of accomplice in this case. It is not the Commonwealth's theory in this case that the Defendant was an accomplice." App. 585-86. In addition, the judge told that jury that they were required to decide the case "in accordance with the instruction which the Court gave you." *Id.* Since "the instruction which the Court gave [the jury]" "at no time referred to any theory of accomplice in this case," *id.* at 585-86, the judge's comments meant that the jury was to decide the case without relying on the theory of accomplice liability. The judge's final statements regarding accomplice liability made exactly the same point. The judge stated: "I can only say this to you, that you should determine this case based on the Charge of the Court as it had given you originally." *Id.* at 587. Jurors are presumed to follow the court's instructions. *Richardson v. Marsh*, 481

U.S. 200, 211 (1987). In view of the instructions given here, it is not reasonably likely that the jury interpreted the judge's comments to mean anything other than that they were not to consider accomplice liability as a possible ground for conviction.

Once the meaning of the judge's comments is understood, it is apparent that there is no merit in Rompilla's argument that his right to due process was violated because he did receive prior notice that he might be subjected to liability as an accomplice or in his argument that the judge's explanation of accomplice liability was constitutionally flawed. Since the trial judge told the jury that it was to decide the case without relying on the theory of accomplice liability, these arguments fail.

Rompilla contends that the trial court told the jury that it should not consider accomplice liability because no evidence was presented during the trial to support such a finding. Rompilla Br. at 16. Rompilla then maintains that the trial judge gave contradictory instructions in that, on the one hand, he told the jury not to consider accomplice liability because there was no evidence to support such a finding and, on the other hand, he told the jury that it was the sole factfinder and its recollection of the evidence should therefore control. According to Rompilla, the jury was left with two irreconcilable options — either to disregard the theory of accomplice liability because the trial court believed there was no evidence to support the theory or to consider the theory if the jury, as sole factfinder, believed, as suggested by its question, that there was evidence of an accomplice.

This elaborate argument rests on the faulty premise that the trial judge instructed the jury that the reason why the theory of accomplice liability was not in the case was because there was no supporting evidence. In fact, however, the judge never made such a statement. The trial judge did state that "[t]here was no evidence in this case with regard to the question as posed," but he did not state that this was why the theory was not in the case. Rather, as noted, the judge twice told the jury that they were not to consider accomplice liability *because it was not in the original charge*, and the judge also noted that "[i]t [was] not the

Commonwealth's theory in this case that the Defendant was an accomplice."

Rompilla's remaining argument (that the trial judge's statements prevented the jury from considering exculpatory and mitigating evidence) entirely misconstrues the judge's words. The judge did not, as Rompilla contends, say that there was no evidence that another person was involved. Rather, the judge stated that "[t]here was no evidence in this case *with regard to the question as posed*." The "question as posed" was: "If Defendant was an accomplice to the Charge of Criminal Homicide, can he be charged with Murder in the First Degree?" Thus, the judge essentially said that there was no evidence to support a conviction under an accomplice liability theory; the judge did not say that there was no evidence that might justify reasonable doubt, or residual doubt for purposes of sentencing mitigation, as to whether Rompilla committed the killing with the requisite intent. Accordingly, nothing that the judge said foreclosed consideration of exculpatory or mitigating evidence.

In sum, after considering all of Rompilla's arguments regarding accomplice liability, we see no ground for habeas relief.

## VIII.

Rompilla contends, finally, that his future dangerousness was put at issue during the sentencing phase of his trial and that therefore, under *Simmons v. South Carolina*, 512 U.S. 154 (1994), the trial court was required to inform the jury that "life" imprisonment under Pennsylvania law means "life without parole." We agree with the District Court, however, that the Pennsylvania Supreme Court's rejection of this claim cannot be disturbed under the narrow standard of review prescribed by AEDPA.

## A.

Rompilla maintains that the state supreme court's decision was "contrary to" and represented "an unreasonable application" of *Simmons*.[18] The actual holding in *Simmons*, however, as set out in Justice O'Connor's

---

18. *Simmons* applies here because it was decided before Rompilla's conviction became final upon conclusion of his direct appeal in 1995. *Cf. O'Dell v. Netherland*, 521 U.S. 151, 156-57 (1997).

controlling opinion, is narrower than Rompilla acknowledges.

In *Simmons*, the defendant was convicted of capital murder for the killing of an elderly woman. *Simmons*, 512 U.S. at 156. The defendant had a history of assaulting elderly women, and both defense and state witnesses agreed that the defendant posed a continuing danger to elderly women. *Id.* at 157. During the penalty phase, the state argued that the question for the jury was "what to do with [the defendant] now that he is in our midst." *Id.* The state also urged that a death sentence would be "a response of society to someone who is a threat. Your verdict will be an act of self-defense." *Id.* The defendant sought to rebut the state's argument by presenting evidence that his dangerousness was limited to elderly women and that there was no reason to expect acts of violence once he was in a prison setting. *Id.* The trial court denied defense counsel's request for a parole ineligibility instruction. *Id.* at 158-60. During deliberations, the jury asked if a life sentence included the possibility of parole. *Id.* at 160. The trial court instructed the jury not to consider parole or parole eligibility and told the jury that life imprisonment and death were to be understood in their plain and ordinary meaning. *Id.* Shortly thereafter, the jury returned with a sentence of death. *Id.*

The United States Supreme Court held that, under these circumstances, due process required the trial judge to inform the jury that the defendant would not have been eligible for parole if sentenced to imprisonment for life. The plurality opinion endorsed by four Justices reasoned that

> the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibility, and *by the State's repeated suggestion that petitioner would pose a future danger to society if he were not executed.*

*Id.* at 161-62 (plurality)(emphasis added). The plurality found that the jury was then "left to speculate about . . . parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer . . . even when it was requested." *Id.* at 165-66. Consequently, the plurality stated that "where the defendant's future dangerousness *is at issue*, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156 (plurality)(emphasis added). *Id.* at 161-62.[19]

The controlling opinion in *Simmons* — Justice O'Connor's concurrence in the judgment, in which the Chief Justice and Justice Kennedy joined — seemed to phrase the holding more narrowly. Justice O'Connor stated that a "defendant should be allowed to bring his parole ineligibility to the jury's attention . . . in cases in which the only available alternative sentence to death is life imprisonment without possibility of parole and *the prosecution argues* that the defendant will pose a threat to society in the future." Id. at 177 (O'Connor, J., concurring in the judgement)(emphasis added). Other passages in Justice O'Connor's opinion pointed in the same direction. She referred to cases " '[w]here *the prosecution specifically relies on a prediction of future dangerousness* in asking for the death penalty,' " *id.* at 175 (emphasis added)(citation omitted)(brackets in original) and cases where "the State seeks to show the defendant's future dangerousness." *Id.* 177. *See also id.* at 176 ("the State sought to show that petitioner is a vicious predator who would pose a continuing threat to the community"); *id.* at 177 ("The prosecutor in this case put petitioner's future dangerousness in issue").

In short, whereas the *Simmons* plurality opinion may be read to state that the *Simmons* rule applies whenever a

---

19. Justice Souter's concurring opinion, in which Justice Stevens joined, was phrased in seemingly broader terms. *See* 512 U.S. at 172 (Souter, J., concurring)("at least when future dangerousness is an issue . . . ."). The *Simmons* dissenters interpreted the plurality opinion as apparently requiring admission of parole ineligibility even when the prosecution does not argue future dangerousness. *Id.* at 183 (Scalia, J., joined by Thomas, J., dissenting).

defendant's future dangerousness is "at issue" (whether or not the prosecution makes that argument), Justice O'Connor's controlling opinion may be read more narrowly to hold that the rule governs only where the prosecution actually "argue[s]" that a defendant poses a future threat. Neither position, of course, has perfectly clear boundaries. There is a sense in which future dangerousness is "at issue" at the penalty phase of virtually all capital cases. The possibility that a first-degree murderer will kill again is likely to be present in the jurors' mind in all cases except those where the defendant committed the murder for which he or she was convicted only because of unusual circumstances that are very unlikely to occur again even if the defendant is released from prison. As the Chief Justice has put it, "[i]t is difficult to envision a capital sentencing hearing where the State presents no evidence from which a juror might make [an inference of future dangerousness to society]." *Kelly v. South Carolina*, 122 S.Ct. 726, 735 (2002)(Rehnquist, C.J., dissenting). Thus, read liberally, the plurality's position in *Simmons* would mandate that the jury be informed about parole ineligibility in almost all capital cases in which the only possible sentences are death or life without parole.

On the other hand, the fine line that Justice O'Connor's opinion seemed to draw — between cases in which the prosecution "argue[s]" future dangerousness and cases in which future dangerousness is inferred by the jury from the evidence that is brought to its attention — is difficult to police and arguably superficial. A prosecutor may encourage a jury to think about future dangerousness without expressly referring to that concept.

Last year, in *Kelly v. South Carolina*, 122 S. Ct. 726 (2002),[20] the Court arguably broadened the holding in *Simmons*. In *Kelly*, the state told the jurors in its opening at the penalty phase: "I hope you never in your lives again

---

20. *Kelly* was decided after briefing was completed and before oral argument in this case. Rompilla submitted a Notice of Supplemental Authority, pursuant to Fed. R. App. P. 28(j). After oral argument both parties submitted supplemental memoranda addressing the issue of whether *Kelly* was applicable to the instant matter.

have to experience what you are experiencing right now. Being some thirty feet away from such a person. Murderer." *Kelly*, 122 S. Ct. at 729. The state then presented evidence that while in prison, Kelly had made a knife, had attempted to escape from prison, and had planned to hold a female guard as a hostage. *Id.* The state also brought out evidence of "Kelly's sadism at an early age, and his inclination to kill anyone who rubbed him the wrong way." *Id.* (citation omitted). During closing arguments, the state referred to Kelly as "the butcher of Batesburg," "Bloody Billy," and "Billy the Kid." *Id.* The state also told the jurors that "Kelly doesn't have any mental illness. He's intelligent . . . He's quick-witted. Doesn't that make somebody a little more dangerous . . . . for this lady . . . doesn't that make him more unpredictable for [the victim] . . . . murderers will be murderers. And he is the cold-blooded one right over there." *Id.* at 729-30. The trial court did not give a parole ineligibility instruction. *Id.* at 730.

The Supreme Court held that Kelly's future dangerousness was sufficiently put at issue that he was entitled to a parole ineligibility instruction. *Id.* at 731, 733-34. In the body of its opinion, the Court stated that "[e]vidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." *Id.* at 732. The Court recognized that "it may well be that the evidence in a substantial proportion, if not all, capital cases will show a defendant likely to be dangerous in the future," but the Court declined to address the issue of whether a defendant is entitled to a parole ineligibility instruction when the state's evidence shows future dangerousness but the prosecutor does not argue it. *Id.* at 732 n.4. The Court concluded that "[t]he prosecutor accentuated the clear inference of future dangerousness raised by the evidence and placed the case within the four corners of *Simmons*." *Id.* at 732.

The *Kelly* dissenters, including two of the Justices who had joined Justice O'Connor's opinion in *Simmons*, argued that the Court had improperly extended *Simmons*'s reach. *See id.* at 735 (Rehnquist, C.J., joined by Kennedy, J.,

dissenting) ("the test is no longer whether the State argues future dangerousness to society[,] [as the Court found in *Simmons*]; the test is now whether evidence was introduced at trial that raises an 'implication' of future dangerousness to society") and *id.* at 737 (Thomas, J., joined by Scalia, J., dissenting) ("the Court dilutes the *Simmons* test, now requiring that a parole ineligibility instruction be given where the prosecution makes arguments that have a '*tendency* to prove dangerousness in the future.' ").

Even if *Kelly* broadened *Simmons*, however, *Kelly* cannot aid Rompilla here. Under 28 U.S.C. § 2254(d)(1), our review is limited to deciding whether a state court decision is "contrary to" or an "unreasonable application" of Supreme Court precedent "*as of the time of the relevant state-court decision.*" *Williams*, 529 U.S. at 412 (emphasis added). The state court decisions in this case preceded *Kelly*. Accordingly, regardless of whether *Kelly* expands the circumstances when future dangerousness is at issue for purposes of requiring a parole ineligibility instruction, the case is not applicable to the instant matter. We are limited to deciding whether the state court decisions in this case were contrary to or an unreasonable application of the holding in *Simmons* itself — which is to say Justice O'Connor's controlling concurrence. We must thus determine whether the Pennsylvania Supreme Court was reasonable in concluding that the prosecutor in the present case did not "argue[ ]" that Rompilla would present a future danger if not sentenced to death. We therefore turn to the relevant events at the penalty phase of Rompilla's trial.

## B.

During the penalty phase, the Commonwealth attempted to establish the aggravating factor that Rompilla had a "significant history of felony convictions" as specified in 423 Pa. C.S. § 9711(d)(9). In doing this, the Commonwealth read into the record the testimony of J.M., a female bar owner whom Rompilla had previously robbed, slashed with a knife, and raped. During closing arguments, the Commonwealth argued:

> [T]he woman that was raped, was raped pretty brutally. She was raped at knife point. . . . [I]sn't it frightening, the similarity between that case and this case. I mean, it is absolutely astounding. Both take place around the bar. The Defendant gets in after closing or right before closing. . . . On both occasions, a knife was used. Steals money both times. Isn't it frightening the similarities in those crimes. Takes a taxi away from [J.M.'s] Bar, takes a taxi the night of this crime. He slashes [J.M.] in the breast with a knife. He uses a knife on Jimmy Scanlon. It's absolutely frightening to think of the similarities in those two crimes. But there is one difference, one major difference, [J.M.] lived through her experience. Jimmy Scanlon didn't. . . . I keep wondering, why did the Defendant wait till Jimmy Scanlon left the Bar? He knew he was closing up. Why didn't he just wait until he had left to break in and steal the money, no problem, nobody gets hurt? You have to ask yourselves, why didn't he wait for Jimmy Scanlon to leave? Was it his intent to kill right from the start? Was it his intent to do serious bodily injury right from the start? Because if he had waited maybe a half hour, an hour later, Jimmy Scanlon would have been gone. This wouldn't be a homicide case. Jimmy Scanlon would still be living. I think the Defendant learned a lesson from [J.M.] in that case, that Rape case. That lesson was, don't leave any witnesses. Don't leave anybody behind that can testify against you.

App. at 779-80.

During deliberations the jury asked:

> If a life sentence is imposed, is there any possibility of the Defendant ever being paroled?

*Id.* at 802. The trial judge answered:

> I'm sorry to say, I can't answer that question. That's not before you as such. The only matter that you can consider in the Sentencing Hearing is the evidence that was brought out in the course of the Hearing and the Law with respect to the Court's Charge. That's the only consideration you have, I'm sorry to say. I — if there were other alternatives that you should consider, we would have outlined them in the Charge, all right.

*Id.* at 802-03.

Several hours later, the jury asked to see the docket entries for Rompilla's prior convictions for the purpose of ascertaining Rompilla's prior sentence. The judge denied the request, and the following exchange took place:

> Juror No. 3:   . . . we want to know if it was — the sentence was — if he got released on behavioral —
>
> Foreman:   It was commuted in any way, the original sentence.
>
> Court:   Well, that we can't give you.
>
> Prosecutor:   You can't tell them.

*Id.* at 823-24.

The next day, after two more hours of deliberation, the jury asked:

> Was the Defendant offered any type of rehabilitation either while in prison or after his release from prison?

*Id.* at 842. The following colloquy then occurred:

> Court:   Well, I'm sorry to say, I can't answer that. I can only tell you that you're going to have to make your decision based upon the evidence that was presented and in accordance with the Law with respect to Sentencing Hearing. First of

> all, I couldn't even answer it if I wanted to or if I could, I don't know.
>
> Foreman: Could I change the question to the point that is — isn't rehabilitation available in prison?
>
> Court: Well, again, I would like to even answer that, and I can't. You're going to have to rely upon your own knowledge of that aspect if, indeed, that is a part that troubles the area that you're interested in. The penology system, I'll be quite frank with you, is not an issue before — before you with respect to the Law that it's a decision that you must make. I can understand your interest, however, as I say, we're constrained to, you know, comply with whatever evidence that was put on in the hearing and then your decision must be based upon whatever the Law says and whatever you may find. All right.

*Id.* at 842-43. Three hours later the jury returned a sentence of death.

The PCRA court found that *Simmons* did not apply because the prosecutor did not argue future dangerousness. App. at 2025. The District Court similarly found that a "fair reading of [the prosecutor's summation] leads to the conclusion that the state's reasoning for the death penalty was not based upon future dangerousness," but rather upon Rompilla's "despicable, savage and cowardly beating" of the victim. *Rompilla*, 2000 WL 964750, at *15. The District Court concluded that although a "close issue," the state supreme court's decision was not an unreasonable application of federal law. *Id.*

## C.

As noted, Rompilla relies on both the "contrary to" and "unreasonable application" prongs of 28 U.S.C. § 2254(d)(1). We will discuss each prong separately.

1.

A result is "contrary to" a Supreme Court holding if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the] Supreme] Court and nevertheless arrives at a [different] result." *Id.* at 405—06. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This prong is not met here because the Pennsylvania Supreme Court applied the holding of *Simmons* and because the facts of *Simmons* and the present case are materially distinguishable.

Rompilla argues that the state supreme court's decision is "contrary to" *Simmons* because the state supreme court did not inquire whether there was "a 'reasonable likelihood' that parole and future dangerousness affected the sentencing decision." Rompilla Br. at 42 (citing *Simmons*, 512 U.S. at 170). We reject this argument. Neither the *Simmons* plurality nor Justice O'Connor's concurrence stated that the test for entitlement to an instruction on parole ineligibility hinges on whether there is a reasonable likelihood that future dangerous might figure in the jury's verdict. Rather, the *Simmons* plurality opinion referred to the concept of "reasonable likelihood" in considering a different question — whether, once future dangerousness was put at issue, there was a "reasonable likelihood" that a jury instruction "directing juries that life imprisonment should be understood in its 'plain and ordinary' meaning" dispelled any misunderstanding that the jurors might have had as to the meaning of life imprisonment. *Simmons*, 512 U.S. at 169-70 (citing *Boyde v. California*, 494 U.S. 370, 380 (1990)).

Rompilla contends that the prosecution necessarily put his future dangerousness at issue by presenting evidence of his prior criminal conduct to establish the aggravating factor that he had a significant history of felony convictions. According to Rompilla, the state supreme court rendered a decision that was "contrary to" *Skipper v. South Carolina*, 476 U.S. 1 (1986) and *Ramdass v. Angelone*, 530 U.S. 156 (2000), when it rejected this argument on the "formalistic" ground that this aggravator concerns past conduct rather than future behavior. Rompilla Br. at 42. This argument is

also meritless. It overlooks the scope of Justice O'Connor's *Simmons* concurrence, which, as noted, can reasonably be read as focusing on the prosecution's arguments, not the inferences that arise from the facts that are proven. On this view, proving past crimes that may cause jurors to worry about future dangerousness is quite different from arguing that a defendant presents a future threat.

In addition, *Skipper* does not hold or even state that proving prior felony convictions is tantamount to arguing that a defendant presents a future threat for *Simmons* purposes. In *Skipper*, the Court held that the capital defendant's right to present all relevant mitigating evidence at the sentencing stage of the trial was violated by the state court's refusal to admit evidence that the defendant had made a good adjustment to jail during the time between his arrest and the trial. Thus, *Skipper* had nothing to do with an instruction on parole ineligibility.[21]

Rompilla's reliance on *Ramdass* is also misplaced. Not only does *Ramdass* post-date the decision of the Pennsylvania Supreme Court, but *Ramdass* does not address the question of when future dangerousness is sufficiently put in issue to require an instruction on parole ineligibility. In *Ramdass*, the prosecution expressly argued future dangerousness as an aggravating circumstance, and thus that point was not disputed. *Ramdass*, 530 U.S. at 161. Instead, the issue in *Ramdass* was whether the defendant was eligible for parole at the time that was relevant for *Simmons* purposes. *See id.* at 166-68.

---

21. Rompilla refers to the *Skipper* Court's statement that "[c]onsideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing." 476 U.S. at 5. If this dictum is true — that people will inevitably draw inferences of probable future behavior from evidence of past conduct — it may argue against drawing the line suggested in Justice O'Connor's *Simmons* concurrence between cases in which the prosecution argues that a defendant presents a future danger and cases in which the facts give rise to an inference of future dangerousness. But that plainly does not make the decision of the Pennsylvania Supreme Court in this case "contrary to" *Skipper*, which was not even a *Simmons* case.

Third, Rompilla argues that his case is "materially indistinguishable" from *Simmons*, but we disagree. In *Simmons*, as noted, the prosecution expressly argued that the defendant posed a future threat, stating that "a verdict for death would be 'a response of society to someone who is a threat. Your verdict will be an act of self-defense.'" *Simmons*, 512 U.S. at 157. In this case, by contrast, the Commonwealth made no specific references to any possible future conduct by the defendant. We thus hold that the decision of the Pennsylvania Supreme Court was not "contrary to" *Simmons*.

## 2.

Rompilla next contends that the state supreme court's decision represents an "unreasonable application" of *Simmons*, but while we agree with the District Court that the application of *Simmons* to the present case would be "close" if we were exercising plenary review, we are convinced that the state supreme court's decision was reasonable.

Rompilla maintains that the state supreme court's decision was unreasonable because its opinion did not discuss all of evidence on which he relies in arguing that his future dangerousness was sufficiently put at issue during the penalty phase of his trial. Rompilla Br. at 45. As we have already explained, however, 28 U.S.C. § 2254(d)(1) calls upon us to decide whether the adjudication of a claim on the merits in state court "resulted in a decision" that "involved an unreasonable application of . . . clearly established Federal law." This standard applies even when a claim is adjudicated on the merits without any discussion at all. *See Weeks*, 528 U.S. at 237; *Chadwick v. Janecka*, 312 F.3d at 606. Accordingly, we must look to the reasonableness of what the state supreme court decided, not the detail included in its opinion.

Rompilla argues that the prosecution raised the issue of future dangerousness in its closing by stating that Rompilla had "learned a lesson" from the prior rape, namely, that he should not leave any witnesses and by repeatedly asking the jury whether the similarities between the rape and his

murder of Scanlon were not "frightening." Rompilla contends that these comments painted a picture of him as a "hardened, frightening, violent recidivist who, if ever released, would commit additional violent crimes and would not 'leave any witnesses.'" Rompilla Br. at 34-35.

We have given this argument careful consideration, but in the end it does not persuade us that the difficult standard of § 2254(d)(1) is met. Reading the Commonwealth's remarks in the context of the entire sentencing proceedings, it appears to us that the Commonwealth did not argue future dangerousness. In her emotional closing argument at the penalty phase, defense counsel argued over and over that, although the jury had found the defendant guilty, they must have had some doubts about his guilt in view of the evidence and that they should therefore not impose a sentence of death. She stated:

> You, as a Jury, convicted him of First Degree Murder. You convicted him, in your minds, beyond a reasonable doubt, but you must have some doubt. There has got to be some doubt there with no eye witness, with circumstantial evidence . . . .

> So I know that you have to have some doubt as to what actually happened that night. We may never know what actually happened that night . . . .

> Don't you want to be sure before you condemn that man to die because don't fool yourselves. A death sentence is death. . . . No more questions after that. . . .

> I saw you all struggling with this. I saw it Monday night at 10:00 o'clock when we let you go for the evening. You looked tired, you looked nervous, and you looked like you've been struggling. . . . [I]f you're struggling with it, the fact that you had some doubt should also stay in your mind, now. If there was any doubt, and I submit to you that there has to be some doubt. There has to be. You don't know what happened. You'll never know exactly what happened. There's got to be some doubt here. . . .

> What if you're wrong? Can you live with that? . . . .
>
> You've rendered what you felt was a just verdict. I have no quarrel with you, that was your job, you came back with a verdict but none of you can tell me that you have no doubts and if you have a doubt, then you better think very, very, carefully about what you're going to do here. . . .
>
> Don't take a chance that you may be making a wrong decision that you can't live with. Please, spare his life, thanks.

App. 767-774.

The prosecutor's remarks upon which Rompilla now relies came in response to these defense comments suggesting that the jury should still have doubts about the defendant's guilt. Seeking to dispel any such doubts, the prosecutor's obvious point in stressing the similarities between the circumstances of the rape for which Rompilla had previously been convicted and the Scanlon murder was to convince the jury that the same man had committed both crimes. Although the prosecutor at times termed the similarities between the two crimes "frightening," it seems clear that he did not use this term to suggest that Rompilla was "frightening" in the sense that he posed a future threat, but simply that the similarities were, as he more aptly put it at another point, "astounding." That his argument did not go to future dangerousness is illustrated by the fact that many of the features of the two crimes that he highlighted — both occurred at a bar, both took place at around closing time, and in both instances the perpetrator used a taxi — are not features that naturally suggest future dangerousness. The prosecutor's further comment that Rompilla had learned a lesson from the rape, i.e., that he should not leave any witnesses, came immediately after this litany of similarities, and the comment seems to have had two likely purposes: to explain why there was no eyewitness to the most recent crime and to explain why the two crimes differed in the important respect that one involved a killing and the other did not.

In any event, even if this interpretation of the prosecutor's comments is incorrect and even if they were

meant to *imply* that Rompilla would present a future danger if he was ever released from prison, the fact remains that the prosecutor never actually argued that Rompilla presented a future threat. Concluding that these facts did not bring the case within the holding of *Simmons*, as set out in the controlling concurrence, is by no means "unreasonable." Particularly in view of the fact that the Justices who endorsed the controlling concurrence in *Simmons* apparently felt that it was important to draw the line where they did, rather than approving the arguably broader reach of the plurality, the state court's failure to extend *Simmons* to situations in which the prosecution does not argue future dangerousness was not an "unreasonable application" of *Simmons*.[22]

Rompilla also argues that the state supreme court's decision is an unreasonable application of Supreme Court law because it "flies in the face of" the state court's prior decisions regarding future dangerousness and prior criminal history and thus violates the Eighth and Fourteenth Amendment requirements that capital sentencing be applied consistently and with an even hand (citing *Eddings v. Oklahoma*, 455 U.S. 349, 361 (1977), and *Gardner v. Florida*, 430 U.S. at 349, 361 (1977). Rompilla Br. at 44. In making this argument, Rompilla points to the passage in the state supreme court opinion addressing his argument that his future dangerousness was put at issue for *Simmons* purposes by the prosecution's effort to prove as an aggravating circumstance that he had a significant history of violent felony convictions. Rompilla-2, 721 A.2d at 795. Rejecting this contention, the state supreme court

---

22. Rompilla points to the testimony regarding his parole status and the lack of rehabilitative services as indicating that his future dangerousness was an issue for the jury. This evidence was brought out by defense counsel on direct examination of Rompilla's witnesses and was not argued by the Commonwealth. Rompilla also points to the jury's questions regarding parole and future dangerousness. Although the questions may demonstrate that the jury did not know the meaning of "life" imprisonment, *see Simmons*, 512 U.S. at 170 n.10; *id.* at 178 (O'Connor, J., concurring); *Rompilla-2*, 721 A.2d at 795 (Flaherty, C.J., dissenting), a jury's uncertainty as to parole ineligibility is insufficient to require an instruction under *Simmons*.

stated that "this aggravating circumstance only addresses Appellant's *past* conduct, not his *future* dangerousness. *Id*. Rompilla attacks this reasoning on the ground that the underlying rationale for this aggravating circumstance is that a history of violent felony convictions is a "barometer of future danger." Rompilla Br. at 44. He therefore contends that the state supreme court's holding in the present case violates the principle that a state must administer its death penalty statute evenhandedly. There is no merit in this argument.

The constitutional principle on which Rompilla relies demands consistency in a state's treatment of its capital cases, and we have not been presented with any evidence that Pennsylvania does not apply the *Simmons* standard evenhandedly. On the contrary, it appears to us that Pennsylvania has uniformly required a *Simmons* instruction when the prosecutor specifically raised the issue of future dangerousness, *see, e.g., Commonwealth v. Trivigno*, 750 A.2d 243, 252-54 (Pa. 2000) (prosecutor asked jury to use prior convictions as a "weather vane looking into the future" and a "determinant of where [the defendant] is going, not just where he's been"); *Commonwealth v. Chandler*, 721 A.2d 1040, 1046-47 (Pa. 1998) (prosecutor asked jury to "stop [the defendant] from ever killing another woman again"), and has not required the instruction when the prosecutor only presented evidence of prior convictions. *E.g., Commonwealth v. Robinson*, 721 A.2d 344, 355 (Pa. 1999) (prosecutor only made references to defendant's past dangerousness); *Commonwealth v. King*, 721 A.2d 763, 779 (Pa. 1998) (prosecutor only made reference to defendant's past violent acts); *May*, 710 A.2d at 47 (prosecutor did not argue future dangerousness). *See also Robinson*, 721 A.2d at 355 (recognizing that the court requires a *Simmons* instruction only when future dangerousness is "expressly implicated").

Rompilla does not dispute the fact that Pennsylvania applies the *Simmons* rule evenhandedly. Instead, his complaint is that there is, in his view, a logical inconsistency between the rationale for the aggravator in question and the Pennsylvania Supreme Court's interpretation of *Simmons*. This argument, however, is

invalid for numerous reasons. First, the constitutional principle on which Rompilla relies concerns consistency in the treatment of cases, not logical consistency in all aspects of a state's death penalty jurisprudence. Second, Rompilla has not identified a logical inconsistency. The Legislature may have adopted the aggravating circumstance in question wholly or partially for the purpose of retribution, not to protect the public from those defendants who are likely to pose a threat. Moreover, even if this aggravating circumstance was intended solely to serve as a "barometer of future danger," there is nothing illogical about taking the position that, while proof of a defendant's past history of violence may tend to suggest that the defendant may pose a future danger if released, the jury should be instructed about parole only in those cases in which there is a particularly strong reason to think that concern about future danger will decisively influence the jury's sentence. Informing a jury about the correctional consequences of a verdict is an exception from usual practice, and it is not illogical to confine this exception to narrow circumstances. Third, if there is a logical inconsistency, it flows from the fine line drawn by the controlling opinion in *Simmons*, not from the Pennsylvania Supreme Court. For all these reasons, Rompilla's argument is rejected.

## IX.

For the reasons set out above, the decision of the District Court is reversed with respect to the ineffective assistance of counsel claim and affirmed as to the accomplice liability instruction and parole ineligibility claims.

SLOVITER, *Circuit Judge, dissenting.*

I respectfully dissent from the well-crafted (albeit, in my view, flawed) decision of the Majority that, in effect, reinstates the death penalty for appellant Ronald Rompilla. There are two claims that I believe warrant the grant of a writ of habeas corpus. One, which was the basis for the District Court's grant of the writ requiring a new sentencing hearing, is the shocking ineffective assistance of counsel at the sentencing phase. Rompilla's trial counsel failed to obtain Rompilla's school, medical, court and prison records as part of their investigation and, as a result, failed to present to the jury any mitigating evidence regarding Rompilla's "childhood, alcoholism, mental retardation, or possible organic brain damage." *Rompilla v. Horn*, 2000 WL 964750, at *9. Counsel also failed to communicate with two of Rompilla's siblings who lived nearby and would have advised counsel of evidence that Rompilla was raised by alcoholic parents in a cold, violent, frightening and abusive home.

The standard for establishing ineffective assistance of counsel was set forth in the Supreme Court's seminal decision in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* was applied in *Williams v. Taylor*, 529 U.S. 362 (2000), to the issue of the investigation required of counsel at the penalty phase. Holding, in "a straightforward application of *Strickland*," that trial counsel was ineffective because he "failed to discover or failed to offer" certain mitigating evidence, *id.* at 393, the Court held that the Virginia Supreme Court decision denying the requested writ of habeas corpus was both contrary to and involved an unreasonable application of *Strickland. Id.* at 391.

As I will discuss, the Pennsylvania Supreme Court's failure to grant relief to Rompilla because of trial counsel's grossly inadequate investigation also was both contrary to and involved an unreasonable application of *Strickland* and *Williams.* The Majority's decision overturning the District Court's grant of a writ of habeas corpus and rejecting Rompilla's claim of ineffective assistance of counsel is inexplicable in light of the Supreme Court's most recent application of *Strickland* in *Wiggins v. Smith*, 123 S. Ct.

2527 (2003), under circumstances remarkably similar to those presented here.

The second ground on which I would grant a writ of habeas corpus is the refusal of the trial judge to advise the jury as to the meaning of a life sentence in Pennsylvania, notwithstanding the jury's questions on that issue on three different occasions during its sentencing deliberations. As a result, the jury imposed a death sentence, rather than a life sentence, without ever being told by the trial court in response to the jury's question that a life sentence in Pennsylvania means life without parole. The Pennsylvania courts' rule in this respect is, in my judgment, an unreasonable application of the Supreme Court's decisions in *Simmons v. South Carolina*, 512 U.S. 154 (1994), and *Kelly v. South Carolina*, 534 U.S. 246 (2002). Because this appeal is literally, not figuratively, a matter of life or death, I elaborate on each of these grounds.

## I.

### *Ineffective Assistance of Counsel*

There is no need to restate the facts of this case and its procedural history, both of which are fully and accurately set forth in the majority opinion. The ineffective assistance of counsel claim is before us on the Commonwealth's appeal.

The applicable legal principles are not in dispute. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), the federal court may grant a petition for habeas corpus only if the state's adjudication resulted in a decision that is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or § 2254(d)(2), the state decision was based on an unreasonable determination of the facts. Both parties agree that it is section 2254(d)(1) that is at issue here. *Strickland* supplies the standard for addressing a claim of ineffective assistance of counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or

> death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

In *Williams*, the Supreme Court held that "the rule set forth in *Strickland* qualifies as clearly established federal law, as determined by the Supreme Court." 529 U.S. at 391 (internal quotation marks omitted). The Court further held that a state decision is "contrary to . . . clearly established" federal law if, *inter alia*, "the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 406. As the decision in *Williams* made clear, relief should be granted under the "unreasonable application" clause "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. *Williams* instructs that "clearly established Federal law" refers "to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." 529 U.S. at 412. The Court in *Wiggins* decided the ineffectiveness of counsel claim before it using the standards articulated in *Strickland*, noting that *Williams* did not create new law, but illustrated "the proper application" of these standards. 123 S. Ct. at 2535. Because *Williams* fell squarely within *Strickland*, *Williams*, 529 U.S. at 390, and *Wiggins* was decided pursuant to the same standards of *Strickland*, these two later cases demonstrate how *Strickland* should be applied.

Under *Strickland*, a petitioner seeking to prove ineffective assistance of counsel must show that counsel's performance was deficient and that the deficiency prejudiced the defense. 466 U.S. at 687. To make the

requisite showing of deficiency, the petitioner must show that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. Among counsel's responsibilities with regard to the sentencing phase is the "obligation to conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396. Coincidentally, in both *Williams* and *Wiggins*, two of the principal Supreme Court cases dealing with ineffective assistance of counsel, the Court found that a writ of habeas corpus was appropriate because the failure of counsel to conduct the requisite thorough investigation was objectively unreasonable and prejudicial.

In *Williams*, the Court noted that counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395. The Court continued,

> Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abuse foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

*Id.* (footnotes omitted). The Court, noting that mitigating evidence "may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case," *id.* at 398, concluded that "the Virginia Supreme Court rendered a 'decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,' thereby violating Williams' constitutional right to the effective assistance of counsel as defined in *Strickland.*" *Id.* at 399.

Our court in *Jermyn v. Horn*, 266 F.3d 257 (3rd Cir. 2001), a decision following *Williams*, concluded that Jermyn's trial counsel was ineffective "because he failed to

conduct an investigation, failed to prepare adequately for the penalty phase of Jermyn's trial, and consequently, failed to present substantial mitigating evidence that would have directly undercut the state's penalty-phase case." *Id.* at 306. We explained,

> Counsel failed to investigate the circumstances surrounding Jermyn's childhood, even though counsel admitted at the PCRA hearing that he was aware that Jermyn had claimed that he was abused as a child. Dr. Phillips told counsel before the original trial that Jermyn had been abused as a child, and told counsel that the abuse was a critical component to understanding Jermyn's mental illness. Nonetheless, counsel did not attempt to locate any fact witness who witnessed the abuse and could testify about it specifically.

*Id.* at 306 (internal citation omitted).

We stated that if counsel had investigated further "he would have obtained powerful and, as the PCRA court noted, 'credible,' testimony" from witnesses who presented testimony at the PCRA hearing that

> was replete with first-hand accounts of instances of mental and physical abuse that Jermyn suffered at the hands of his father. . . . Counsel could have used that testimony to provide the jury with critical insight into the root of Jermyn's mental illness. The [witnesses'] testimony also offered valuable insight into Jermyn's mother's role in the household, and how she failed to intervene on Jermyn's behalf.

*Id.* at 306-07. Counsel in *Jermyn* "also did not seek to obtain records from the school which corroborate the fact that Jermyn was abused as a child, and that his mother did not intervene on his behalf." *Id.* at 307. Based on the ineffective assistance of counsel for this and other reasons set forth in that opinion, we affirmed the District Court's grant of a writ of habeas corpus.

With these cases as a background, we turn to the conduct of Rompilla's trial counsel, informed by the Supreme Court's recent decision in *Wiggins*.

Counsel in this case were two public defenders. Frederick Charles, the senior of the two, was a veteran attorney with significant criminal trial experience as a defense lawyer, who never before tried a capital case. His role here was as the principal counsel for Rompilla at the guilt phase. His colleague, Maria Dantos, who was two and a half years out of law school at the time of the trial, App. at 1060-61, 1065-67, was given the responsibility of handling the penalty phase. She had the role of making the arguments and presenting witnesses at the penalty phase, under Charles' supervision. This was her first capital case and first homicide trial. Counsel's devotion to Rompilla's cause has not been challenged. They impressed the District Court as "intelligent, diligent and devoted to their task of representing [Rompilla]." 2000 WL 964750, at *9. It is their competence and effectiveness that are at issue.

The PCRA court determined that "counsel had a reasonable basis for proceeding as they did during the penalty phase," Maj. Op. at 17 (quoting App. at 2028), because counsel retained three health professionals, two of whom, Drs. Cooke and Sadoff, are "recognized experts in the fields of psychiatry and psychology," *id.*, who administered tests, evaluated Rompilla and reported back to defense counsel that they found that nothing could be used in mitigation. Counsel also obtained an evaluation by a local psychiatrist, Dr. Paul Gross, who found nothing that would have been beneficial in the penalty phase.

In affirming the PCRA court's determination rejecting, *inter alia*, Rompilla's claim of ineffective assistance of counsel, the Supreme Court of Pennsylvania concluded that counsel "reasonably relied upon their discussions with [Rompilla] and upon their experts to determine the records needed to evaluate mental health and other potential mitigating circumstances." *Commonwealth v. Rompilla*, 721 A.2d 786, 790 (Pa. 1998).

In accepting the Pennsylvania courts' conclusions, the Majority also concludes that "trial counsel conducted an extensive investigation for mitigation evidence," Maj. Op. at 27, because trial counsel retained three well-qualified mental health experts to examine Rompilla. The Majority recognizes that counsel failed to seek out school, medical,

police, and prison records, which they recognize "contain useful information about Rompilla's childhood home environment, his mental problems, and his problems with alcohol," Maj. Op. at 29. Nevertheless, the Majority characterizes counsel's decision as "reasonable" because Charles, who "had the final say on every issue in the case," Maj. Op. at 29, "did not think that obtaining those records would have represented a sound allocation of his office's resources." Maj. Op. at 29. The question before us is not whether we believe counsel's explanation for his failure to obtain the relevant records, some of which were available across the street from the trial and others in the same building as the trial, was "reasonable" but whether his failure to take such action to save money was objectively reasonable and consistent with his obligation to conduct a thorough investigation.

A comparison of counsel's actions in this case with those of counsel in *Wiggins*, where the Supreme Court concluded that counsel was ineffective, is instructive.

Wiggins, who was represented by two public defenders, was convicted of capital murder in 1989 by a Maryland judge, and the jury sentenced him to death the same afternoon. A divided Maryland Court of Appeals affirmed. He filed a motion for post-conviction relief in which he challenged the adequacy of his representation at sentencing, "arguing that his attorneys had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background." *Wiggins*, 123 S. Ct. at 2532. At the PCRA hearing, a licensed social worker testified regarding an elaborate social history in which he chronicled Wiggins' "bleak life history" based on state social services, medical and school records and interviews with Wiggins and numerous family members. *Id.* at 2533. His mother, a chronic alcoholic, frequently left him and his siblings alone for days, forcing them to beg for food and to eat paint chips and garbage. Her abusive behavior included beating the children and having the children present while she engaged in her active sexual life. Wiggins suffered severe physical and sexual abuse at the hands of his mother and father and while in the care of a series of foster parents. The

father in his second foster home repeatedly molested and raped him. In one foster home, he was gang raped on more than one occasion and was sexually abused by his supervisor on a job corps program. *Id.*

Wiggins' counsel decided to focus their request for post-conviction relief on retrying the factual case and disputing Wiggins' direct responsibility for the murder. Notwithstanding that counsel, as a practical matter, did not compile a social history of Wiggins, the state post-conviction court concluded that when the decision not to investigate is a matter of trial tactics, there is no ineffective assistance of counsel. *Wiggins*, 123 S. Ct. at 2533. The Maryland Court of Appeals affirmed the denial of relief on the ground that trial counsel, although they knew of Wiggins' unfortunate childhood and had available both the presentence investigation report and the more detailed social service records, "made a reasoned choice to proceed with what they thought was their best defense." *Id.* at 2533-34.

In holding that *Wiggins*' trial counsel provided constitutionally ineffective assistance of counsel and that the Maryland Court of Appeals unreasonably applied *Strickland* in failing to so conclude, the Supreme Court specified why counsel's conduct was defective. The Court noted that trial counsel had limited their investigation to two sources. One was the presentence investigation report (PSI) prepared by the Division of Parole and Probation, "which included a one-page account of Wiggins' 'personal history' noting his 'misery as a youth,' quoting his description of his own background as 'disgusting,' and observing that he spent most of his life in foster care,"123 S. Ct. at 2536 (quoting PSI). The other source counsel examined was the records kept by the Baltimore City Department of Social Services (DSS) documenting Wiggins' various placements in the state foster care system. The Supreme Court noted that counsel chose not to expand their investigation beyond those records even though the Public Defender's Office made funds available for the retention of a forensic social worker. *Id.* The Supreme Court thus concluded that, "counsel abandoned their investigation of [Wiggins'] background after having acquired

only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 2537.

The Supreme Court characterized the Maryland Court of Appeals' application of *Strickland*'s governing legal principles as "objectively unreasonable." *Id.* at 2538. That court merely assumed that counsel's investigation was adequate and failed to focus on counsel's failure to engage in further investigation, despite the information in the DSS records with respect to Wiggins' mother's alcoholism, his shuttling from foster home to foster home, and his lengthy absences from school. Further investigation would have discovered the sexual abuse that was later revealed during state post-conviction proceedings. *Id.*

The investigation by Rompilla's lawyers, albeit different from that conducted by Wiggins' lawyers, was similarly defective. They did not present at the penalty phase evidence that was available, had they investigated thoroughly, and which was presented for the first time at Rompilla's PCRA hearing. Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. App. at 1408, 1416-17, 1450, 1460, 1487, 1492, 1495-96. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags. These facts were not presented at the sentencing hearing because counsel did not know them and, more important for our purposes, failed to make the reasonable investigation that would have uncovered them.

Rompilla's counsel presented the testimony of three of Rompilla's siblings at the sentencing hearing but did not interview two of Rompilla's sisters, Barbara Harris and Randi Rompilla, both of whom lived nearby, prior to sentencing, App. at 1422, 1436-37, 1489-90, and did not present their testimony. Further, Rompilla's brother, Nicholas Rompilla, Jr., who had briefly testified at the sentencing hearing, claimed at the post-conviction hearing that Rompilla's counsel only asked him about the three months prior to the offense and did not ask him about Rompilla's childhood. App. at 1462-63. We must then ask whether it was unreasonable for counsel not to have interviewed all of Rompilla's siblings. It was these family members who testified at the PCRA hearing that, among other things, their parents were alcoholics and their mother drank while pregnant with Rompilla. They detailed the physical abuse referred to above. Rompilla was told he was stupid and would not amount to anything; they also testified that Rompilla was a "very nervous child," who kept everything inside. App. at 1407-13, 1424, 1451, 1480-84, 1487-88.

It was Rompilla's PCRA counsel, not trial counsel, who presented evidence from two mental health experts, Drs. Armstrong and Crown, both of whom evaluated and tested Rompilla post-conviction. Their evaluations included neuropsychological testing, review of Rompilla's school, medical, and prison records (none of which had been examined by trial counsel), and review of declarations by Barbara Harris, Darlene Rompilla, and Nicholas Rompilla, Jr., App. at 1562-64, 1567, 1704, 1736, 1741, 1743, 1745; Commonwealth Response to Habeas Pet., Exh. B, C, & Pet., Exh. B, C, & D. The doctors stated that Rompilla's low IQ and achievement test results documented in his school records, his medical history, and his abusive background were all "red flags" indicating that further objective evaluation was necessary. App. at 1614, 1686, 1692-93, 1739, 1743, 1745-46.

These doctors determined that Rompilla suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions: impulsivity, reasoning and judgment, ability to make sense

out of experience, ability to draw conclusions, ability to accept long-term consequences of immediate behavior, emotional liability, concentration, mental flexibility, recalling and integrating information, controlling behavior, and controlling motor movements (hands). App. at 1572-74, 1577-79, 1581-84, 1617-18, 1707, 1717-18, 1721-22, 1726, 1728-33. The doctors believe Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome. App. at 1601-02, 1606, 1615. They concluded that Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense. App. at 1616, 1687-88, 1735-36.

The PCRA court, applying Pennsylvania's three-prong standard for ineffective assistance of counsel claims, stated that although Rompilla's claim arguably had merit because he was "entitled to have relevant information of mental infirmity" presented to the jury, App. at 2028, "[g]iven the fact that three health care professionals, all of whom were experienced forensic experts, had provided opinions to defense counsel, and none of them asked for more information, it was hardly unreasonable or ineffective for defense counsel to have relied upon their opinions." App. at 2030.

The PCRA court accepted Rompilla's trial counsel's testimony that they had spoken to family members in detail and that the family had not revealed the information that was claimed in the PCRA hearing. App. at 2029-30. The court also noted that Rompilla "made contradictory statements" to counsel during their representation, and that he had not indicated he had any mental problems or alcoholic blackouts. App. at 2029. The PCRA court concluded that counsel was reasonable in believing that seeking mercy was the only available strategy, and found that there was a reasonable basis for counsel's actions. App. at 2029-30.

The Pennsylvania Supreme Court, also citing the state's three-prong test for ineffective assistance of counsel claims, agreed with the PCRA court's conclusion that counsel was effective, concluding without discussion that counsel acted reasonably. *Rompilla*, 721 A.2d at 789-90. The Court,

relying on the conclusions of the PCRA court, noted that counsel had investigated Rompilla's mental health by retaining three experts and reasonably relied on the experts and on their own discussions with Rompilla to determine the records needed to evaluate Rompilla, and it effectively adopted the PCRA court's credibility determination of trial counsel's conversations with family members, leading it to conclude that counsel had not failed to investigate. The Court rejected Rompilla's argument that the experts received inadequate information because of counsel's failure to investigate his background. *Id.*

An examination of the record shows that Rompilla's lawyers did less investigation into mitigating evidence than did counsel for Wiggins. The Pennsylvania Supreme Court, in affirming the decision of the PCRA court denying post-conviction relief, stated that there was no "arguable merit" in Rompilla's claim that trial counsel failed to investigate Rompilla's family background, *Rompilla*, 721 A.2d at 790. The Court never referred to counsel's failure to speak to two of Rompilla's siblings, Randi Rompilla and Barbara Harris, who lived nearby and who attended the trial. Dantos, when questioned at the post-conviction hearing, said that she didn't remember whether she spoke to those sisters or not, App. at 1099-1100, but those sisters testified at the PCRA hearing that they would have testified at the penalty phase, if asked, and would have told counsel about Rompilla's dysfunctional background, if they had been asked.

Counsel certainly had reason to inquire further as to the availability of other family members. Counsel was aware that the family members whom she interviewed did not know a great deal about Rompilla. Charles testified that the family said "they hardly know him." One said, "He was in a reformatory. He's been away the whole time. We didn't know him well." Even Dantos testified that "[T]he overwhelming response from the family was that they didn't really feel as though they knew him all that well since he had spent the majority of his adult years and some of his childhood years in custody. . . ," App. at 1094, and that the family had "limited knowledge of their brother." App. at 1098. Dantos stated that "it seemed pretty clear that [the family members she interviewed] didn't feel as though they

knew Ron very well," App. at 1166. It is thus apparent that trial counsel had sufficient leads, as in *Wiggins*, to investigate further to find family members who did know more about Rompilla's youth. Counsel never explained why she did not interview the other sisters.

The Pennsylvania Supreme Court, in rejecting Rompilla's PCRA claim that counsel did not obtain records that would have aided the mental health experts who evaluated him, agreed with the PCRA court that counsel reasonably relied on their experts to determine the record needed to evaluate his mental health. *Rompilla*, 721 A.2d at 790. Counsel cannot so easily shed their constitutional obligations. Moreover, it appears that counsel directed the experts to the guilt phase, giving no or little attention to the penalty phase.

Rompilla's lawyers sought opinions from the mental health experts they hired primarily about Rompilla's "mental infirmity or mental insanity for the guilt phase." App. at 1069-71. Although Dantos stated that she also instructed the experts to see if there was any issue "to possibly use in mitigation any mental infirmity," *id.* at 1067, Dr. Gross' report says that counsel's instruction as to the evaluation was "to determine Mr. Rompilla's mental state during the time of the alleged charges." *Id.* at 1069. That is supported by Dantos' own testimony that the mental health professionals employed by the defense were asked to look into Rompilla's "mental state at the time of the commission of the offense." App. at 1071. Counsel did not themselves investigate Rompilla's medical history, drug use, birth trauma or developmental delays; did not request or instruct the medical experts they retained to investigate those issues, and the medical experts did not make any such investigation. Counsel did not provide Drs. Sadoff and Cooke, who saw Rompilla, with any of the records that would have shown Rompilla's long history of alcoholism and never themselves investigated the records that would have shown that history.

Rompilla's counsel did not seek or obtain any of Rompilla's school records and therefore did not learn that Rompilla was in special education, left school in the 9th grade, and that his abilities had not advanced beyond the

third grade, suggesting mental retardation because of a possible organic brain disorder. *Rompilla*, 2000 WL 964750, at *4-*7. Because they did not obtain these records, they did not provide them to the health experts they retained.

The PCRA court, on which the Pennsylvania Supreme Court relied, did not explain its finding that the school records were "not entirely helpful" beyond noting that Rompilla's IQ can "simply be part of the Bell Curve and a learning disability is not necessarily caused by an organic defect,"a statement made by Dr. Cooke, one of the experts retained by Rompilla's trial counsel. App. at 2029. Trial counsel failed to investigate further into Rompilla's retarded level IQ scores. Indeed, Dr. Cooke further testified at the PCRA hearing that had he been provided with Rompilla's IQ scores at trial he would have done testing for brain damage, looked for evidence of prenatal damage to Rompilla's brain, and looked at the family situation, whether it was an abusive situation, or dysfunctional situation. App. at 1800-01.

Counsel did not investigate records from the Pennsylvania Department of Corrections where Rompilla was incarcerated for 14 years and therefore did not learn that his adult scores on achievement tests were very low, his spelling and arithmetic achievement scores were below 96% of the population, App. at 1009, and that psychological tests performed showed serious abnormalities on the schizophrenia, paranoia, neurosis and obsessive/compulsive scales. *See* App. at 1595-99. The court records, which counsel did not investigate, were used by the Commonwealth as an aggravating circumstance and were in the same courthouse where Rompilla's case was tried. Because counsel failed to investigate into Rompilla's prior correctional experience, they did not provide that information to the health experts they retained.

In *Wiggins*, the Supreme Court quoted from the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989), which provide that investigations into mitigating evidence " 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by

the prosecutor.'" 123 S. Ct. at 2537 (emphasis in original). Because Wiggins' counsel abandoned the investigation of his background by failing to pursue evidentiary leads provided in the DSS records, they fell short of these "well-defined norms." *Id.*

As shown by the above, the investigations by Rompilla's counsel were no more thorough, perhaps less, than those found inadequate by the Supreme Court in *Wiggins.* The Majority's attempt to reconcile its conclusion that Rompilla's counsel provided effective assistance of counsel with the conclusion in *Wiggins* that defendant's counsel were ineffective is nothing short of astonishing. The Majority states that "[t]here are critical differences between the conduct of Wiggins's and Rompilla's trial attorneys." Maj. Op. at 38. It continues, "Wiggins's attorneys were presented with leads that 'any reasonably competent attorney' would have realized were promising. Rompilla's attorneys had no comparable leads." *Id.*

With due respect to my colleagues on the Majority, the distinction entirely misses the point. If it was ineffective for Wiggins' counsel to fail to follow up the leads they had, was it not even more ineffective, indeed inexcusable, for Rompilla's attorneys to fail to investigate to find the leads that could have been used by the experts they retained or to retain experts to testify at the penalty phase and present a viable case for mitigation? At the brief sentencing hearing, trial counsel called only five witnesses, Rompilla's sister Darlene, older brother Nicholas, Jr., younger brother Robert, sister Sandy Whitby and Aaron, Rompilla's fourteen-year old son. The total examination covered about 26 pages of notes of testimony. The witnesses testified in general that Rompilla was a good family member and never had a problem. As described by the District Court, the "testimony was apparently presented to engender sympathy for [Rompilla]." 2000 WL 964750, at *4. "It seemed to be designed primarily as an emotional appeal to the jury to show mercy to [Rompilla] — he wasn't as bad as he seemed and his family loved him." *Id.* In lieu of the case trial counsel presented in mitigation, a case that the District Court described as "unreasonably brief and lacking in real substance," 2000 WL 964750, at *4, had they investigated

they could have presented a case such as that presented by the PCRA counsel. Rompilla's counsel shifted the responsibility for finding leads to the medical experts, and never even told their experts that they had the responsibility for uncovering that information.

In *Wiggins*, trial counsel made the tactical decision to forego mitigating evidence of Wiggins' dysfunctional background and mental health problems because they believed that Wiggins' "best hope of escaping the death penalty was for one or more jurors to entertain a reasonable doubt as to his criminal agency." *Wiggins v. State*, 724 A.2d 1, 15 (Md. 1999), a decision the Maryland Supreme Court termed a "deliberate, tactical decision" which, under *Strickland*, should not be second guessed. *Id.* at 15, 17-18. When the United States Supreme Court reviewed that decision under § 2254(d), it held that because counsel's investigation was inadequate, the state court's "subsequent deference to counsel's strategic decision . . . despite the fact that counsel based this alleged choice on what we have made clear was an unreasonable investigation, was also objectively unreasonable." *Wiggins*, 123 S. Ct. at 2538.

The PCRA court found that Rompilla's counsel "had a reasonable basis for proceeding as they did," App. at 2028, because they employed two experts and obtained an evaluation by another psychiatrist, who also advised counsel that he found nothing that would be beneficial in the penalty phase. The Pennsylvania Supreme Court agreed that "trial counsel was effective with respect to their investigation and presentation of mitigation evidence." *Rompilla*, 721 A.2d at 790. Notwithstanding the decision in *Wiggins*, the Majority, applying § 2254(d)(1), holds that "the state court's determination that counsel acted reasonably was not 'contrary to' or an 'unreasonable application' of *Strickland*." Maj. Op. at 41.

As noted above, I believe the Majority seriously errs. It is clearly established by both *Williams* and *Wiggins* that counsel or counsel's experts cannot make a reasonable decision at the penalty phase if they do not investigate the relevant facts that could be used in mitigation. In holding that the Maryland Court of Appeals' application of

*Strickland*'s governing legal principles was objectively unreasonable, Justice O'Connor, in *Wiggins*, stated that counsel's failure to thoroughly investigate made "a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 123 S. Ct at 2538. Therefore the state Supreme Court's holding "reflected an unreasonable application of *Strickland*." *Id.* What was true in *Wiggins* and before that in *Williams* is equally applicable here. It follows that the District Court properly determined that Rompilla's trial counsel did not meet the performance standards required under *Strickland*.

I believe that under the circumstances in which counsel presented an inadequate case for mitigation at the penalty phase of a capital sentencing hearing, the prejudice prong of constitutionally ineffective assistance of counsel is clearly met. The Pennsylvania Supreme Court did not reach this issue and therefore we may consider it *de novo*. A reasonable attorney, if aware of the evidence presented at the PCRA hearing following a thorough investigation, would have done more at sentencing than plead for mercy. As the Court stated in *Wiggins*, "had the jury been confronted with [the] considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." 123 S. Ct. at 2543. Quoting from *Williams*, the Court stated, "we must evaluate the totality of the evidence, both that adduced at trial, and the evidence adduced in the habeas proceeding." *Wiggins*, 123 S. Ct. at 2543, citing *Williams*, 529 U.S. at 397-98. In *Williams*, the Court recognized that the graphic description of the defendant's childhood "filled with abuse and privation, or the reality that he was 'borderline mentally retarded' might well have influenced the jury's appraisal of his morale culpability." 529 U.S. at 398 (citation omitted). The Court further stated that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.*

In considering prejudice to Rompilla from his trial counsel's performance, we should look at the totality of evidence adduced at trial as well as that adduced at the state post-conviction hearing where counsel, after a

thorough investigation, found the evidence of Rompilla's abusive background, his disfunctional family situation, his low IQ, his meager reading and understanding ability found in the prison records, and the medical evidence of brain disfunction. The jury could certainly have considered this matter as sufficiently mitigating to warrant a different sentence. Therefore, I believe that the Supreme Court of Pennsylvania failed to reasonably apply the *Strickland* standard when it held that Rompilla had not shown ineffective assistance of counsel.

I therefore disagree with the majority and would affirm the District Court's grant of a writ of habeas corpus because of trial counsel's ineffective assistance of counsel.

## II.

### *Failure to Give a* Simmons *Instruction*

Rompilla has cross-appealed from the District Court's denial of a writ of habeas corpus on Rompilla's claim that his right to due process was violated by the state trial court's refusal to inform the jury in response to the jury's inquiries that Rompilla was parole ineligible if sentenced to life imprisonment.

While the jury was deliberating Rompilla's penalty, life imprisonment or death, the jury asked in succession, "If a life sentence is imposed, is there any possibility of the Defendant ever being paroled?" App. at 802. The trial court responded:

> I'm sorry to say, I can't answer that question. That's not before you as such. The only matter that you can consider in the Sentencing Hearing is the evidence that was brought out in the course of the Hearing and the Law with respect to the Court's Charge. That's the only consideration you have, I'm sorry to say. I—if there were other alternatives that you should consider, we would have outlined them in the Charge, all right. Are there any other questions?

App. at 802-03.

The jury later requested to examine information with respect to Rompilla's prior sentence. The trial court refused because it was not entered into evidence. The jury foreman clarified that the jury wanted to know the sentence from Rompilla's prior conviction. The trial court stated that he cannot give that. A juror then asked "if he got released on behavioral . . ." and the foreman added, "It was commuted in any way, the original sentence." App. at 823. As before, the trial court refused to give the requested information. App. at 824.

Finally, the next day, after more deliberation the jury asked, "Was the Defendant offered any type of rehabilitation either while in prison or after his release from prison?" App. at 842. Once again the trial court declined to answer, even after the foreman changed the question to ask "isn't rehabilitation available in prison?" App. at 842. The trial court again refused to provide the information sought by the jury. It was only after the trial court declined to provide the information requested by the jury time after time that the jury returned a sentence of death.

On Rompilla's appeal from the denial of his PCRA petition, the Supreme Court of Pennsylvania rejected Rompilla's contention that due process required that the jury be instructed that in Pennsylvania "life imprisonment means life," ruling as follows:

> Under the current state of the law in Pennsylvania, the jury must be told that life means life without parole only when the defendant's future dangerousness is at issue. *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31, 35-36 (Pa. 1998). Appellant argues that his future dangerousness was at issue because the Commonwealth argued the aggravating circumstance that he has a significant history of felony convictions involving the use or threat of violence. The Court rejected this argument in *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44, 47 (Pa. 1998). As stated in that case, this aggravating circumstance only addresses Appellant's past conduct, not his future dangerousness. *See id.* Thus, no relief is due.[10]
>
> [10]This author [Justice Nigro] agrees with the dissent's position that a *Simmons* instruction should be given in

all cases and has previously so stated. *See Clark*, 710 A.2d at 43-44 (Nigro, J., concurring, joined by Flaherty, J. and joined in relevant part by Zappala, J.); *May*, 710 A.2d at 49 (Nigro, J., concurring, joined by Zappala, J.). Under the current state of the law, however, Appellant's argument that he was entitled to the instruction because the Commonwealth argued the aggravating circumstance identified above, is without merit. *See May*, 710 A.2d at 47.

*Commonwealth v. Rompilla*, 721 A.2d 786, 795 (Pa. 1998). In his dissent, Chief Justice Flaherty wrote:

I believe the majority is in error in its treatment of the issue pertaining to the jury's question about the defendant's parole eligibility. Under *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) and *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31, 35-36 (Pa. 1998), the court must tell a jury that a life sentence means life without parole, if the defendant requests the instruction and his future dangerousness is at issue. Here, during deliberations in the penalty phase, the jury asked, "If a life sentence is imposed, is there any possibility of the Defendant ever being paroled?" I view this question as a clear expression of the jury's concern about the defendant's future dangerousness. I would therefore hold that the trial court's refusal to explain the meaning of life without parole constituted error under *Commonwealth v. Clark*, *supra*. I would therefore reverse the order of the court of common pleas and remand for proceedings consistent with this opinion.

I would go further and require an explanation of the meaning of a life sentence in all capital cases. There can be no harm in instructing juries that in Pennsylvania appellant would be statutorily ineligible for parole if sentenced to life in prison, but that a life sentence might nonetheless be commuted by the governor. On the other hand, if we do not so instruct, a jury, erroneously believing that a prisoner sentenced to life may be paroled within a period of years, may impose the death penalty for reasons which are not based in law.

*Id.* at 795-96 (Flaherty, C.J., dissenting).[1]

I believe that the Pennsylvania Supreme Court's analysis of Rompilla's *Simmons* claim was an "unreasonable application" of Supreme Court precedent, specifically *Simmons v. South Carolina*, 512 U.S. 154 (1994), and *Kelly v. South Carolina*, 534 U.S. 246 (2002), and therefore that it must be reversed under the standards of AEDPA.

In *Simmons*, the Supreme Court held that the defendant's due process right to answer an allegation against him requires the trial court to instruct the jury that the alternative to the death penalty is life without parole (in states where that is the alternative) if the prosecutor argues that the defendant will pose a danger to others. As Justice Blackmun, who authored the plurality opinion, wrote: "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." *Simmons*, 512 U.S. at 171. In *Shafer v. South Carolina*, 532 U.S. 36 (2001), the Supreme Court described *Simmons* as holding that when "a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.' " *Id.* at 39 (quoting *Ramdass v. Angelone*, 530 U.S. 156, 165 (2000) (plurality opinion)).

---

1. I find it difficult to glean much enlightenment from the two cases cited by the Pennsylvania Supreme Court. In *Commonwealth v. Clark*, 710 A.2d 31 (Pa. 1998), the Court did not define what it meant to put future dangerousness "at issue" because the question did not arise. (In *Clark* it was not the Commonwealth that argued future dangerousness; rather, the defense argued the opposite, noting that chances of a commuted sentence in Pennsylvania were close to zero; the court gave an instruction defining life imprisonment.) As for *Commonwealth v. May*, 710 A.2d 44 (Pa. 1998), its proposition that "[t]he aggravating circumstance of appellant's prior record for violent felonies addressed only appellant's past conduct, not his future dangerousness," is a mere unsupported assertion. *Id.* at 47.

The *Simmons* plurality and Justice O'Connor, concurring, believed there was no question that the prosecutor had made an issue of Simmons's future dangerousness. As a result, the Court had no occasion to define what constitutes making an issue of future dangerousness. That issue was directly addressed eight years later in *Kelly*, an opinion of the Court authored by Justice Souter.

In *Kelly*, the prosecutor stated that he would not argue future dangerousness and "that takes it out of *Simmons* anyhow." *Kelly*, 534 U.S. at 249. The trial court then denied Kelly's counsel's request for a *Simmons* instruction, saying that the State's evidence went to Kelly's character and characteristics, not to future dangerousness. The South Carolina Supreme Court affirmed the conviction and death sentence, holding that the *Simmons* instruction was not required because future dangerousness was not at issue.

In reversing, Justice Souter stated that the South Carolina Supreme Court's statement that Kelly's future dangerousness was not at issue "is unsupportable on the record before us." *Id.* at 252. He continued, "It is not that the state court failed to pose the legal issue accurately, for in considering the applicability of *Simmons* it asked whether Kelly's future dangerousness was 'a logical inference from the evidence,' or was 'injected into the case through the State's closing argument.'" *Id.* at 252 (internal citations omitted). In support of the appropriateness of this statement of the legal issue, Justice Souter included the following citations and explanatory parentheses: "*Shafer*, [532 U.S.] at 54-55 (whether prosecutor's evidence or argument placed future dangerousness in issue) [and] *Simmons*, 512 U.S. at 165, 171, (plurality opinion) (future dangerousness in issue because 'State raised the specter of . . . future dangerousness generally' and 'advanc[ed] generalized arguments regarding the [same]')." *Kelly*, 534 U.S. at 252.

In addressing the trial court's interpretation of the evidence, the *Kelly* Court explained why the trial court erred:

> To the extent that it thought that "[e]vidence that Kelly took part in escape attempts and carried a shank . . .

is not the type of future dangerousness evidence contemplated by *Simmons*," . . . it overlooked that evidence of violent behavior in prison can raise a strong implication of "generalized . . . future dangerousness." *Simmons*, [512 U.S.] at 171. (And, of course, the state court's reasoning says nothing about the evidence of the crime, or of Kelly's sadism generally, and his mercurial thirst for vengeance.) *A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior*, whether locked up or free, and whether free as a fugitive or as a parolee.

*Id.* at 253-54 (emphasis added).

In language particularly relevant to this case, the *Kelly* Court stated, "The fallacy of the State Supreme Court's attempt to portray the thrust of the evidence as so unrealistically limited harks back to a comparable mistake by the trial judge, who spoke of the evidence as going, not to future dangerousness, but 'to [Kelly's] character and characteristics.' " *Id.* at 254. The Court continued,

The error in trying to distinguish *Simmons* this way lies in failing to recognize that evidence of dangerous "character" may show "characteristic" future dangerousness, as it did here. This, indeed, is the fault of the State's more general argument before us, that evidence of future dangerousness counts under *Simmons* only when the State "introduc[es] evidence for which there is *no other possible inference* but future dangerousness to society." . . . Evidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms.

*Id.* (emphasis in original).

The *Kelly* Court thus made explicit what was implicit in *Simmons*: the prosecutor need not expressly and separately argue future dangerousness; rather, future dangerousness can be made an issue through implication by or inference

from arguments addressing such independent matters as the defendant's character.

At Rompilla's sentencing hearing, the prosecutor, who was seeking the death penalty, focused on Rompilla's "significant history of felony convictions," as that is one of the statutory factors that can serve as "aggravators" in the balancing between mitigating factors and aggravating factors required under Pennsylvania's death penalty law. 42 Pa. Cons. Stat. Ann. § 9711(d)(9). During his closing argument the prosecutor referred to Rompilla's prior offense, which involved the robbery, rape and slashing with a knife of a female bar owner, in the following terms:

> Joe Macrenna, the woman that was raped, was raped pretty brutally. She was raped at knife point. . . . [I]sn't it *frightening*, the similarity between that case and this case. I mean, it is absolutely astounding. Both take place around the bar. The Defendant gets in after closing or right before closing. . . . On both occasions, a knife was used. Steals money both times. Isn't it *frightening* the similarities in those crimes. Takes a taxi away from Joe's Bar, takes a taxi the night of this crime. He slashes Joe in the breast with a knife. He uses a knife on Jimmy Scanlon. It's absolutely *frightening* to think of the similarities in those two crimes. But there is one difference, one major difference, Joe Macrenna lived through her experience. Jimmy Scanlon didn't. . . . I think the Defendant learned a lesson from Joe Macrenna in that case, that Rape case. *That lesson was, don't leave any witnesses.* Don't leave anybody behind that can testify against you.

App. at 779-80 (emphasis added).

At sentencing the jury also learned via testimony elicited by both parties that the instant crime occurred shortly after Rompilla had been released from prison, that there is a lack of rehabilitation services for prisoners, that Rompilla's children were initially frightened of him when he was released on parole, and that he had been paroled from his previous sentence only three weeks before the instant crime.

Rompilla argues that because the prosecutor placed Rompilla's future dangerousness at issue, the trial court was required under *Simmons* to inform the jury that Rompilla is parole ineligible. The PCRA court disagreed, reasoning that *Simmons* does not apply because the prosecutor did not argue future dangerousness. The court stated, "The prosecution merely argued that Mr. Rompilla had a significant history of felony convictions which was proper argument as an aggravating factor under Pennsylvania law." App. at 2025. The court did not find the jury's question concerning whether he had received rehabilitation supportive of Rompilla's argument: "This question . . . relates more to the issues raised by the defense witnesses during the penalty phase who complained that Mr. Rompilla had not received rehabilitation while in prison and while on parole after his 1974 rape and burglary convictions. In fact, that was a mitigating factor found by the jury rather than an aggravating factor." App. at 2026. The court did not address, perhaps did not recognize, the relevance of the jury's question concerning whether rehabilitation is available in prison to Rompilla's request for a *Simmons* instruction.

On appeal, the Pennsylvania Supreme Court summarized the facts and issue, and analyzed Rompilla's *Simmons* claim in one paragraph which I quoted in full near the beginning of this dissent. The Pennsylvania Supreme Court interpreted Pennsylvania law as requiring a *Simmons* instruction "only when the defendant's future dangerousness is at issue," and expressly rejected Rompilla's argument that in presenting Rompilla's extensive criminal history the prosecutor *ipso facto* made future dangerousness an issue. The Pennsylvania Supreme Court thus appears to have determined that future dangerousness must be argued expressly and separately and may not be implied by or inferred from other arguments; consequently, the prosecutor's recitation of defendant's past criminal conduct cannot, without more, also amount to making an issue of future dangerousness. It is unclear whether the Pennsylvania Supreme Court believes this principle to be consistent with or required by *Simmons*.

When the *Simmons* issue was before the District Court on Rompilla's habeas petition, that court also gave the issue only brief analysis and concluded:

> The prosecutor's summation in this case covers 16 pages of the notes of testimony[2] and a fair reading of it leads to the conclusion that the state's reasoning for the death penalty was not based upon future dangerousness but on the despicable, savage and cowardly beating the Petitioner inflicted upon his victim. This is a close issue, however, but the Supreme Court of Pennsylvania's decision in the PCRA case was not an unreasonable application of federal law.

*Rompilla v. Horn,* 2000 WL 964750, at *15 (E.D. Pa. July 11, 2000). The District Court appears to have agreed with the Pennsylvania Supreme Court that if the prosecutor "based his argument on" the despicable nature of the defendant's actions, he could not at the same time have made an issue of Rompilla's future dangerousness for *Simmons* purposes without providing a separate, express argument to that effect. The Majority appears to agree, as its opinion states: "even if [the prosecutor's comments] were meant to imply that Rompilla would present a future danger if he was ever released from prison, the fact remains that the prosecutor never expressly argued that Rompilla presented a future threat." Maj. Op. at 63-64.

I do not read *Simmons* as requiring an express argument of future dangerousness. In *Simmons,* the prosecutor put future dangerousness "at issue" in a few brief comments in his closing argument. As the *Simmons* plurality opinion describes it:

> In its closing argument the prosecution argued that petitioner's future dangerousness was a factor for the jury to consider when fixing the appropriate punishment. The question for the jury, said the prosecution, was "what to do with [petitioner] now that he is in our midst." . . . The prosecution further urged that a verdict for death would be "a response of society to someone who is a threat. Your verdict will be an act of self-defense."

---

2. That is not accurate: it covers eight pages. *See* App. at 774-782.

512 U.S. at 157.

In his dissent, Justice Scalia takes issue with the conclusion of those Justices who formed the majority that the above statements constituted an argument for future dangerousness.[3] The language used in the various opinions

---

3. The dissent states:

> Both Justice Blackmun and Justice O'Connor focus on two portions of the prosecutor's final argument to the jury in the sentencing phase. First, they stress that the prosecutor asked the jury to answer the question of "what to do with [petitioner] now that he is in our midst." That statement, however, was not made (as they imply) in the course of an argument about future dangerousness, but was a response to petitioner's mitigating evidence. Read in context, the statement is not even relevant to the issue in this case:

>> "The defense in this case as to sentence . . . [is] a diversion. It's putting the blame on society, on his father, on his grandmother, on whoever else he can, spreading it out to avoid that personal responsibility. That he came from a deprived background. That he didn't have all of the breaks in life and certainly that helps shape someone. But we are not concerned about how he got shaped. We are concerned about what to do with him now that he is in our midst.". . . .

> Both opinions also seize upon the prosecutor's comment that the jury's verdict would be "an act of self-defense." That statement came at the end of admonition of the jury to avoid emotional responses and enter a rational verdict:

>> "Your verdict shouldn't be returned in anger. Your verdict shouldn't be an emotional catharsis. Your verdict shouldn't be . . . a response to that eight-year-old kid [testifying in mitigation] and really shouldn't be a response to the gruesome grotesque handiwork of [petitioner]. Your verdict should be a response of society to someone who is a threat. Your verdict will be an act of self-defense." . . . .

> This reference to "self-defense" obviously alluded, neither to defense of the jurors' own persons, nor specifically to defense of persons outside the prison walls, but to defense of all members of society against this individual, wherever he or they might be. Thus, as I read the record (and bear in mind that the trial judge was on the lookout with respect to this point), the prosecutor did not *invite* the jury to believe that petitioner would be eligible for parole — he did not *mislead* the jury.

*Simmons*, 512 U.S. at 181-182 (Scalia, J., dissenting) (emphasis in original).

of the Justices who formed the *Simmons* majority does not suggest that the prosecutor must expressly argue that defendant will be a serious threat if not sentenced to death before the Court will hold that future dangerousness has been placed before the jury. For example, Justice Blackmun's opinion uses the following phrases (emphases added, *passim*): "where the defendant's future dangerousness *is at issue*," *id.* at 156; "[t]he Due Process Clause does not allow the execution of a person '*on the basis of information* which he had no opportunity to deny or explain.'" *Id.* at 161; "the State's *repeated suggestion* that petitioner would pose a future danger to society if he were not executed," *id.* at 162; "[t]he State *raised the specter* of petitioner's future dangerousness generally . . . ," *id.* at 165; "if the State *rests its case for imposing the death penalty at least in part* on the premise that the defendant will be dangerous in the future . . . ," *id.* at 168-69; "[t]he State may not create a false dilemma *by advancing generalized arguments* regarding the defendant's future dangerousness . . . ," *id.* at 171.

In his concurring opinion, Justice Souter writes, "when future dangerousness *is an issue* in a capital sentencing determination . . . ." *Id.* at 172 (emphasis added). Similarly, Justice O'Connor states, "When the State *seeks to show* the defendant's future dangerousness," and "a means of responding to the State's *showing* of future dangerousness." *Id.* at 177. "Moreover, the prosecutor, by referring to a verdict of death as an act of 'self-defense,' *strongly implied* that petitioner *would* be let out eventually if the jury did not recommend a death sentence." *Id.* at 178 (emphasis added).

There are indeed some statements that can be read to refer to arguments expressly made by the State as to Simmons's future dangerousness, particularly in the concurring opinion of Justice O'Connor, but even she uses the phrase "strongly implied." I therefore repeat my observation that neither Justice O'Connor nor the other Justices forming the majority suggest that the instruction must be given only if the prosecutor makes express, explicit, exclusive arguments for future dangerousness. Rather, the Court was willing to infer a future

dangerousness argument from what was, on Justice Scalia's account, an argument about a different topic entirely (the merit of one of Simmons's mitigating factors). Nothing in the Justices' language supports the premise on which the Pennsylvania Supreme Court's decision turns. Any doubts on the matter were dispelled by the Supreme Court's subsequent decision in *Kelly* where the prosecutor did not expressly argue future dangerousness.

The Majority concedes that *Kelly* "arguably broadened the holding in *Simmons*," Maj. Op. at 51, and notes that two of the Justices who joined Justice O'Connor's concurring opinion in *Simmons* dissented in *Kelly* because "the test is no longer whether the State argues future dangerousness to society . . . [but] whether evidence was introduced at trial that raises an 'implication' of future dangerousness to society." *Kelly*, 534 U.S. at 261 (Rehnquist, C.J., joined by Kennedy, J., dissenting).

The Majority declines to apply *Kelly* in Rompilla's favor, stating, "Even if *Kelly* broadened *Simmons* . . . *Kelly* cannot aid Rompilla here" because *Kelly* was decided after the Pennsylvania Supreme Court's decision in Rompilla's case. Maj. Op. at 53. The Majority notes that under *Williams v. Taylor*, 529 U.S. 362 (2000), federal review pursuant to section 2254(d)(1) is limited to the state court's application of federal law "as of the time of the relevant state-court decision." *Id.* at 412.

The Supreme Court does not interpret the unreasonable application of Supreme Court precedent prong of § 2254(d)(1) as narrowly as does the Majority. In *Wiggins*, the Court viewed its opinion in *Williams* as "illustrative of the proper application" of the *Strickland* standard, notwithstanding that "*Williams* had not yet been decided at the time the Maryland Court of Appeals rendered the decision at issue in this case." *Wiggins*, 123 S. Ct. at 2535. Just as the *Williams* opinion noted that "the merits of [Williams's] claim are squarely governed by our holding in *Strickland v. Washington*," *Williams*, 529 U.S. at 390, so also the Court's opinion in *Kelly* represented an application of *Simmons* and did not make new law. There is no indication anywhere in the opinion that the *Kelly* majority thought that they were doing anything other than applying

*Simmons*. Rather, at every step of the way the *Kelly* majority cites *Simmons*. At one point, the *Kelly* majority states that the prosecutor "accentuated the clear implication of future dangerousness raised by the evidence and [thereby] placed the case within the four corners of *Simmons*." *Kelly*, 534 U.S. at 255. Therefore, even if *Kelly* "arguably" broadened *Simmons*, it is dispositive for present purposes that the majority of the Supreme Court believed otherwise.

To recapitulate, the Pennsylvania Supreme Court applied an unjustifiedly narrow test for determining whether the prosecutor made an issue of Rompilla's future dangerousness. That test represented an unreasonable application of *Simmons*, especially as *Simmons* was applied in *Kelly*.

In any event, I believe that the record shows that the prosecutor did make an issue of Rompilla's future dangerousness. It is noteworthy that the prosecutor referred to the similarities between this crime and Rompilla's previous crime as "frightening" no less than three times. The similarities can be "frightening" only if the prosecutor was sending the message that there is a possibility that Rompilla will repeat the crime. Similarly, the prosecutor's emphasis on the one major difference between this crime and his previous crime — the murder of the victim — and his statement to the jury that Rompilla had learned not to leave any witnesses were tantamount to a warning about what would happen if Rompilla were allowed to commit another crime, i.e., that Rompilla would be dangerous. Moreover, as the Supreme Court has recognized, evidence of past criminal conduct may be indicative of future dangerousness. *See Skipper v. South Carolina*, 476 U.S. 1, 5 (1986).

The Majority urges us to consider the prosecutor's comments in context, claiming he was merely responding to counsel's argument that the jury must have some doubt concerning Rompilla's guilt and that his comments were a rebuttal of that argument, not an argument for future dangerousness. The Majority states, "Seeking to dispel any such doubts, the prosecutor's obvious point in stressing the similarities between the circumstances of the rape for

which Rompilla had previously been convicted and the Scanlon murder was to convince the jury that the same man had committed both crimes." Maj. Op. at 63.

The Majority's attempt to explain the remark is sheer conjecture. The prosecutor made his remarks in the course of outlining why three aggravating factors apply against Rompilla. After addressing the first two — torture and murder while committing other crimes — the prosecutor said:

> Commonwealth has more. Commonwealth submits to you that the Defendant has a significant history of felony convictions involving violence to the . . . person or the threat of violence to the person.

App. at 779. The prosecutor then described the previous rape with his above-quoted use of "frightening" and gave the State's explanation that Rompilla did not wait at the bar until Scanlon closed up before breaking in to steal because Rompilla did not want to leave any witnesses. App. at 780. This suggests dangerousness, not rebuttal.

It is plain from *Simmons* and *Kelly* that the reasons for the prosecutor's statements are not dispositive of whether they put future dangerousness at issue for the jury. They could have done so even if their principal thrust were to dispel doubt raised by the defense. After all, in *Simmons* the prosecutor's remarks were made in response to defense counsel's mitigating evidence (*see* Justice Scalia's dissenting opinion, quoted above). Thus, even if the prosecutor in Rompilla's case did not make an express argument, *Simmons* is still applicable because, as explained above, *Simmons* does not require "express arguments."

The Majority also asserts that the prosecutor merely used the word "frightening" as a synonym for "astounding," a word that the prosecutor also used ("more aptly," as the Majority puts it). Maj. Op. at 63. Accepting *arguendo* the Majority's hypothesis, it does not negate the implication of future dangerousness. The meaning of a word or phrase depends in part on the reasonable understanding of the listener, not merely the intent of the speaker.

The Majority also attempts to discount any future

dangerousness implications in the prosecutor's statement that by the time of this crime Rompilla had learned to kill any eyewitnesses by explaining that "the comment seems to have had two likely purposes: to explain why there was no eyewitness to the most recent crime and to explain why the two crimes differed in the important respect that one involved a killing and the other did not." Maj. Op. at 63. Again, even if those were the prosecutor's purposes, it does not follow that he did not also thereby inject future dangerousness into the proceedings. The more immediate message learned by the jury was surely that if they put Rompilla in a position from which he could commit another crime, the jurors had better not be among the witnesses. Their repeated questions to the judge concerning parole and rehabilitation suggests that they had learned that lesson.[4]

---

4. This court is limited to reviewing the Pennsylvania Supreme Court's opinion for its consistency with federal law, and has no role in its application of state law. It is of interest, however, that there is disagreement among the Pennsylvania Supreme Court justices themselves as to whether the jury need be instructed that in Pennsylvania the jury may not be informed that life imprisonment means life without parole. Pennsylvania is one of only two states out of the 50 United States where life imprisonment means life without parole that hold that the jury may not be so informed. South Carolina, the state that was the subject of the Supreme Court decisions in *Simmons*, *Kelly*, and *Skipper*, is the other such state.

The Pennsylvania rule was enunciated in *Commonwealth v. Mills*, 39 A.2d 572 (Pa. 1944), where the Pennsylvania Supreme Court stated that in a capital case the jury's only function was to decide whether the penalty should be life imprisonment or the death penalty. More recently, the Pennsylvania Supreme Court, in addressing the effect of *Simmons* on the rule announced in *Mills*, stated that "the per se rule announced in *Mills* [that any reference to the possibility of parole was an improper consideration for the jury in their deliberation of the defendant's guilt] has been superseded [by *Simmons*]." *Clark*, 710 A.2d at 36. The Pennsylvania Court then stated "that due process requires the court to instruct the jury on the law as it relates to the possibility of parole where that issue [the defendant's future dangerousness] clearly arises from the arguments of either counsel in the penalty phase." *Id.* Justice Nigro concurred, suggesting "that the better practice and policy is to require trial courts to give a *Simmons* instruction in all death penalty proceedings, regardless of whether counsel raises the issue of a defendant's potential future dangerousness during the penalty phase." *Id.* at 43. Justice Zappala concurred separately, agreeing with Justice Nigro that a *Simmons* charge should be mandated. *Id.*

Justice Souter, in his concurring opinion in *Simmons*, joined by Justice Stevens, wrote:

> The Eighth Amendment entitles a defendant to a jury capable of a reasoned moral judgment about whether death, rather than some lesser sentence, ought to be imposed. The Court has explained that the Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case," *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion of Stewart, Powell, and Stevens, JJ.); see also, *e.g.*, *Godfrey v. Georgia*, 446 U.S. 420, 427-428 (1980); *Mills v. Maryland*, 486 U.S. 367, 383-384 (1988). Thus, it requires provision of "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), and invalidates "procedural rules that ten[d] to diminish the reliability of the sentencing determination," *Beck v. Alabama*, 447 U.S. 625, 638 (1980).
>
> That same need for heightened reliability also mandates recognition of a capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentences (or sentencing recommendations) a jury is required to consider, in making the reasoned moral choice between sentencing alternatives. Thus, whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning, and a death sentence following the refusal of such a request should be vacated as having been "arbitrarily or discriminatorily" and "wantonly and . . . freakishly imposed." *Furman v. Georgia*, 408 U.S. 238, 249 (1972) (Douglas, J., concurring) (internal quotation marks omitted); *id.*, at 310 (Stewart, J., concurring).

*Simmons*, 512 U.S. at 172-73 (Souter, J., concurring).

In this case, the repeated questions by the jury as to the effect of a sentence by them of life imprisonment demonstrate unequivocally that the jury did not understand

that under Pennsylvania law a life prison term means life without parole. I believe the rationale for requiring that the jury be instructed about parole ineligibility when the prosecutor puts future dangerousness in issue — i.e., to ensure that the jurors have accurate information as to the effect of their sentence — is similarly applicable in a case, such as this one, where the jurors have requested accurate information. I do not understand the State to be arguing that the requested instruction was not legally accurate. The Majority has provided no rationale why the jury should not be informed of the applicable Pennsylvania law. Truth in advertising is now the byword of this generation. Truth in instructing the jury as to the effect of the sentence in a capital case is at least as important.

I would grant a writ of habeas corpus on this issue as well as on the ineffective assistance of counsel issue.

A True Copy:
     Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*